[Civ. No. 18214. Third Dist. Sept. 30, 1981.]

CALIFORNIA MEDICAL ASSOCIATION et al., Plaintiffs and Appellants, v.
JEROME A. LACKNER, as Director, etc., et al., Defendants and Respondents;
COALITION FOR THE MEDICAL RIGHTS OF WOMEN et al., Interveners and Respondents.

COUNSEL

Hassard, Bonnington, Rogers & Huber, Charles F. Bond II, Howard Hassard, David E. Willett and Maureen E. Corcoran for Plaintiffs and Appellants.

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, and Joseph O. Egan, Deputy Attorney General, for Defendants and Respondents.

Erica Black Grubb, Lois Salisbury, Vilma S. Martinez, Linda Hanten, Carmen A. Estrada, Patti Roberts and Joan Messing Graff for Interveners and Respondents.

Dorothy T. Lang, Barbara Steinhardt and Roberta Ranstrom as Amici Curiae on behalf of Interveners and Respondents.

OPINION

**BLEASE, J.**—The California Medical Association and four physicians (collectively referred to as CMA) appeal from a judgment upholding State Department of Health Services regulations which establish procedures for securing informed consent for human sterilization. We hold that the regulations reasonably implement the department's regulatory authority over unnecessary operations. We affirm the judgment.

FACTS

In May of 1977, the California Department of Health (now Department of Health Services) promulgated two regulations establishing procedures for securing informed consent for human sterilization. One governed sterilizations covered by the state's Medi-Cal scheme (Welf. & Inst. Code, § 14000 et seq.). (Former Cal. Admin. Code, tit. 22, §§ 51163, 51305.1-51305.7, effective Dec. 1, 1977 pursuant to § 51305.8.) The other applied to sterilizations performed in "acute care" hospitals (Health & Saf. Code, § 1250). (Cal. Admin. Code, tit. 22, §§ 70037.1, 70707.1-70707.8, effective Dec. 1, 1977, pursuant to § 70707.9.) Because the issues concerning the Medi-Cal regulations

have become moot,[1] we are here concerned only with the hospital regulations.

The hospital regulations (as did the Medi-Cal regulations) required that the patient be 18 years of age and competent to "understand the content and nature of the informed consent process" (former Cal. Admin. Code, tit. 22, § 51305.5, subds. (a)(1) and (2); § 70707.5, subds. (a)(1) and (2)), detailing the information to be given to the patient,[2] in-

---

[1]CMA contended that the Medi-Cal regulations exceeded the department's statutory authority to "promulgate regulations . . . and . . . adopt a standard informed consent form . . . for use by [Medi-Cal] health care providers performing *voluntary nonemergency sterilizations*" (italics added) (Welf. & Inst. Code, § 14191), insofar as they were applied to so-called "secondary sterilizations" (i.e., therapy whose "primary purpose . . . is to correct or treat a medically recognized abnormal condition or disease but which also renders an otherwise infertile person permanently incapable of producing offspring." (Former § 51163, subd. (2).) CMA does not dispute that this contention has been rendered moot by the adoption after the trial of a new definition of "human reproductive sterilization" which excludes "secondary sterilizations" by embracing "any medical treatment, procedure or operation, *for the purpose* of rendering an individual permanently incapable of reproducing." (Italics added.) (Former Cal. Admin. Code, tit. 22, § 51163, subd. (a).) (See *Blinder* v. *Division of Narcotic Enforcement* (1972) 25 Cal.App.3d 174, 181 [101 Cal.Rptr. 635] [argument rendered moot by subsequent amendment of statute].) Instead, it argues that the department's authority under Welfare and Institutions Code section 14191 to promulgate regulations respecting the "documents evidencing informed consent" required before sterilizations may be performed is not broad enough to embrace the mandatory waiting periods prescribed by the regulations. The argument cannot be sustained, since, as CMA concedes, the legislative purpose behind section 14191 was to enable the department to remain in conformity with federal informed consent requirements and the waiting periods merely reflect the federal requirement *defining* what amounts to effective informed consent to a sterilization under Medi-Cal, which consent must be "evidenced" in appropriate documents.

[2]The regulations required disclosure of certain information about the contemplated procedure: (1) the surgical procedure to be used and how sterilization results therefrom; (2) the type of anesthesia to be used; (3) the approximate length of time to be spent in the hospital and for recovery; (4) the effectiveness of the procedure in producing permanent irreversible sterilization; (5) whether the procedure is new or experimental; (6) the financial cost to the patient; and (7) confirmed or suspected short and long-term consequences, including common side effects and discomforts, significant health risks and complications, and the benefits to be expected. (Former Cal. Admin. Code, tit. 22, § 51305.3, subd. (8); § 70707.3, subd. (f).)

In addition, they required that the patient be given: (1) the name of the physician performing the procedure; (2) assurance that he or she was free to withdraw consent at any time prior to the sterilization without prejudicing future care or losing public program benefits; and (3) any facts reflected in the patient's medical record which might be material to his or her decision. (Former Cal. Admin. Code, tit. 22, § 51305.3, subd. (g); § 70707.3, subd. (g).) For elective sterilizations, they also required that the patient be advised of alternative procedures and methods of birth control and provided an informational booklet on sterilization (or read the contents thereof if he or she was not fluent in English or Spanish). (Former Cal. Admin. Code, tit. 22, § 51305.5, subds. (a)(5) and (6); § 70707.5, subds. (a)(5) and (6).)

validating consent given while the patient is in an "altered" mental state or in labor or given less than 24 hours after giving birth or after undergoing an abortion (former Cal. Admin. Code, tit. 22, § 51305.3, subd. (a); § 70707.3, subd. (a)) and, except for "emergency sterilizations[s]" (*id.*, at §§ 51305.1, 70707.1), requiring a 14-day minimum waiting period before a sterilization may be performed unless the patient requested in writing that it be performed sooner, though not sooner than 72 hours (*id.*, at § 51305.2, subd. (a)(2); § 70707.2, subd. (a)(2)). The provisions differed somewhat in the sanctions imposed for noncompliance (possible revocation or suspension of license in the hospital regulations (§ 70707.8) and nonpayment for services under the Medi-Cal regulations (§ 51305.7)), but both provided that noncomplying physicians be reported to the Board of Medical Quality Assurance.

CMA was denied a preliminary injunction and the regulations took effect on December 1, 1977. After hearings on cross-motions for summary judgment, on April 24, 1978, the trial court filed its opinion and order denying CMA's motion (except as to the provision prohibiting sterilizations for patients under 18 years of age[3]) and granting the motions of defendants and interveners (respondents). This appeal followed.

After CMA's opening brief was filed, the Medi-Cal informed consent regulations were amended in response to new federal Medicaid regulations (42 C.F.R. §§ 50.201-50.210). The amended regulations (Cal. Admin. Code, tit. 22, §§ 51163, 51305.1-51305.6), filed June 24, 1980, and effective October 15, 1980, conform to the federal regulations. (Welf. & Inst. Code, § 14191.[4])

---

[3]The amended hospital regulations are responsive to the trial court's ruling, in that they permit sterilizations for persons under 18 if they are married, over 15 years of age and emancipated, or in the armed services. (22 Cal. Admin. Code, § 70707.1, subd. (a)(1).) Welfare and Institutions Code section 14191, which plaintiffs admit is a provision designed specifically to keep Medi-Cal regulations on informed consent to sterilization in conformity with federal requirements (see discussion, *infra*) provides authority for the restriction on the availability of sterilizations to those over 21 years of age in the amended regulation, section 51305.1, subdivision (a)(1). (And see *Voe* v. *Califano* (D.Conn. 1977) 434 F.Supp. 1058; cf. *Harris* v. *McRae* (1980) 448 U.S. 297 [65 L.Ed.2d 784, 100 S.Ct. 2671], rehg. den. 448 U.S. 917 [65 L.Ed.2d 1180, 101 S.Ct. 39].)

[4]Welfare and Institutions Code section 14191 provides: "Notwithstanding any other provision of law, no payment for care or services shall be made under Medi-Cal to the attending physician under this chapter for the costs of any voluntary non-emergency sterilization unless the treatment authorization request is accompanied by the documents evidencing informed consent required by regulations of the department. In the

A short time later, the hospital regulations (Cal. Admin. Code, tit. 22, §§ 70037.1, 70707.1-70707.8) were amended (to continue) to parallel the Medi-Cal regulations. The amended rules differ from the regulations challenged in several respects. They exclude "secondary sterilizations." (§ 70037.1, subd. (a).) They increase the minimum waiting period to 30 days, waivable to 72 hours in connection with emergency abdominal surgery or premature delivery under the Medi-Cal regulations, and by written request under the proposed hospital regulations. (§ 51305.1, subd. (a)(6); § 70707.1, subd. (a)(4).) The information required to be given patients remains substantially the same as that required under the former regulations. (§§ 51305.3; 70707.4.)

## DISCUSSION

### I

■ CMA attacks the (hospital) informed consent regulations as exceeding the regulatory powers of the Department of Health Services over hospitals. (Gov. Code, § 11342.1; *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 411 [128 Cal.Rptr. 183, 546 P.2d 687]; *California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800, 810 [84 Cal.Rptr. 590, 85 Cal.Rptr. 735].) It claims that there is no authority to regulate professional treatment within which it includes the securing of informed consent.

"The task of the reviewing court in such a case '"is to decide whether the [agency] reasonably interpreted the legislative mandate." [Citation.]' (*Credit Ins. Gen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651, 657 [128 Cal.Rptr. 881, 547 P.2d 993].)" (*Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032]; see also *Ralph's Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 176 [70 Cal. Rptr. 407, 444 P.2d 79]; *Morris* v. *Williams* (1967) 67 Cal.2d 733 [63

---

event that the department does not require a treatment authorization request, such documents evidencing informed consent shall accompany the billing of the attending physician. The department shall promulgate regulations under this article and shall adopt a standard informed consent form in English and Spanish which is readily understandable to Medi-Cal beneficiaries for use by health providers performing voluntary nonemergency sterilizations. [¶] The failure of the attending physician performing the sterilization to fulfill his obligations under this section shall not be construed as requiring the department to deny or withhold reimbursement under Medi-Cal to other providers participating in the sterilization."

Cal.Rptr. 689, 433 P.2d 697].) We conclude that the department's interpretation is reasonable and uphold the hospital regulations.

There is no statute which expressly *states* that the department may adopt informed consent regulations applicable to hospitals (as there is under the Medi-Cal statutes—Welf. & Inst. Code, § 14191) and CMA attempts to exploit this void by a limiting construction of the statutory authority of the department. That authority is to be found in the following statutes.

The Department of Health Services has licensing power over various health facilities including hospitals. (Health & Saf. Code, § 1250 et seq.)[5] It is given general (§ 208[6]) and specific (§ 1275[7]) regulatory authority to carry out its hospital licensing duties and powers and to fulfill the intent of the licensing laws. In section 1276 it is directed to adopt regulations which "shall prescribe standards of adequacy, safety and sanitation of the physical plant, of staffing with duly qualified licensed personnel, and of services, based on the type of health facility and the needs of the persons served thereby." (Italics added.) (§ 1276.) It is also

---

[5]All references, unless otherwise noted, are to the Health and Safety Code.

[6]Section 208 provides: "(a) It may adopt and enforce rules and regulations for the execution of its duties. [¶] (b) All regulations heretofore adopted by the State Department of Health or its predecessors relating to public health, the licensing and certification of health facilities, except the *licensing of community care facilities,* or any other function performed by the Division of Public Health of the State Department of Health, and in effect immediately preceding the operative date of the amendment of this section enacted by the Legislature during the 1977-78 Regular Session, shall remain in effect and shall be fully enforceable unless and until readopted, amended, or repealed by the director or as otherwise provided by Section 25 or other provisions of law. This subdivision shall not apply to any regulation relating to a function transferred to a different state agency or department as a result of another provision of the statutes enacted during the 1977-78 Regular Session." (Amended by Stats. 1979, ch. 1152, § 16.)

[7]Section 1275, as applicable here (amended by Stats. 1973, ch. 1202, § 2, p. 2570), provided: "The state department shall adopt, amend, or repeal, in accordance with Chapter 4.5 (commencing with Section 11371) of Part 1 of Division 3 of Title 2 of the Government Code, such reasonable rules and regulations as may be necessary or proper to carry out the purposes and intent of this chapter and to enable the state department to exercise the powers and perform the duties conferred upon it by this chapter, not inconsistent with any of the provisions of any statute of this state. [¶] All regulations in effect on December 31, 1973, which were adopted by the State Board of Public Health, the State Department of Public Health, the State Department of Mental Hygiene, or the State Department of Health relating to licensed health facilities shall remain in full force and effect until altered, amended, or repealed by the director."

granted enforcement powers (§§ 1277,[8] 1294[9]) which, as we shall show, support the adoption of regulations.

CMA argues that the statutory scheme limits the scope of the department's authority to the specific subjects of the hospital licensing statutes contained in division 2, chapter 2, of the Health and Safety Code (§ 1250 et seq.). It characterizes these subjects as the power "(1) to supervise construction and maintenance of the health facility to assure adequacy, safety and sanitation of the plant; (2) to establish minimum credentials for the health facility personnel staff; (3) to insure that the 'basic' or 'special' services are needed in the community; and (4) to insure that qualified staff and adequate facilities are available before a special or basic services permit will be issued." CMA views the "evident purpose of the entire chapter ... [as] to insure that substandard and unnecessary facilities are not licensed, and Sections 1276 and 1277 should be interpreted in that light." CMA concludes that no authority is granted to regulate the doctor-patient relationship within which it includes matters of informed consent.

At the outset, we observe that the informed consent regulations do not represent a novel assertion of regulatory authority by the department[10] and that the department has statutorily been recognized as

---

[8]Section 1277 prohibits the issuance of a license by the department "unless it finds that the premises, the management, the bylaws, rules and regulations, the equipment, the staffing, both professional and nonprofessional, and the *standards of care and services* are adequate and appropriate and that the health facility is operated in the manner required by this chapter and by the rules and regulations adopted hereunder." (Italics added.)

[9]Section 1294 authorizes the department to revoke a hospital's license for "[v]iolation ... of the rules and regulations promulgated under this chapter" or "[c]*onduct inimical to the public health*, morals, welfare or safety of the people of the State of California *in the* maintenance and *operation of* the premises or *services* for which a license or special permit is issued." (Italics added.)

[10]The department has adopted informed consent regulations previous to those at issue here.

One such regulation requires hospitals and medical staffs to adopt written policies on patients' rights, which must include, inter alia, the right to "(5) [r]eceive as much information about any proposed treatment or procedure as the patient may need in order to give informed consent or to refuse this course of treatment. Except in emergencies, this information includes a description of the procedure or treatment, the medically significant risks involved in this treatment, alternate courses of treatment or nontreatment and the risks involved in each and to know the name of the person who will carry out the procedure or treatment." (Cal. Admin. Code, tit. 22, § 70707, subd. (b)(5).) Another regulation, which is concerned with recordkeeping, controls the disposition of informed consent forms. (§ 70749.) A third, as part of the surgical service require-

having competency to regulate sterilization operations. (Welf. & Inst. Code, § 14191; see *ante*, fn. 4.) Moreover, the Legislature has placed at least a portion of the subject of sterilization operations within the hospital licensing statutes. Health and Safety Code section 1258[11] prohibits the conditioning of hospital sterilization operations by "special nonmedical qualifications" such as "age, marital status and number of natural children." It also states that "nothing in this section shall prohibit requirements relating to the physical or mental condition [of the patient] or affect the right of the attending physician to counsel or advise his patient as to whether sterilization is appropriate...."[12]

These provisions make sterilization operations a subject of statutory concern and suggest that the exception for "requirements relating ... to the physical or mental condition" preserves these matters for regulation by the department. CMA reads section 1258 differently.

CMA contends that portions of the informed consent regulations (e.g., waiting periods and special forms) conflict with section 1258's prohibition on "nonmedical qualifications." We disagree. The "nonmedical qualifications" named in the statute—age, marital status, number of children—unambiguously imply that the evil in mind is the use of socio-economic factors to determine whether or not to permit an individual to be sterilized. (See *Selected 1972 Legislation* (1973) 4 Pacific L.J. 679, 680.) No such factors are here present. We agree with the trial

ments imposed on hospitals, requires the person in charge of anesthesia to review the patient's record prior to surgery, making him responsible for assuring the presence of the informed consent form. (§ 70223, subd. (d)(3).)

[11]Section 1258 provides: "No health facility which permits sterilization operations for contraceptive purposes to be performed therein, nor the medical staff of such health facility, shall require the individual upon whom such a sterilization operation is to be performed to meet any special nonmedical qualifications, which are not imposed on individuals seeking other types of operations in the health facility. Such prohibited nonmedical qualifications shall include, but not be limited to, age, marital status, and number of natural children. [¶] Nothing in this section shall prohibit requirements relating to the physical or mental condition of the individual or affect the right of the attending physician to counsel or advise his patient as to whether or not sterilization is appropriate. This section shall not affect existing law with respect to individuals below the age of majority."

[12]CMA argues that the limiting language relating to consultation rules out the informed consent regulations. However, provisions recognizing a doctor's right to counsel a patient concerning the appropriateness of sterilization can be read, and we do, as gramatically and substantively consistent with the informed consent regulations. We do not understand in what way a doctor's right to counsel a patient regarding the (medical) appropriateness of a sterilization operation is furthered by the patient's ignorance or incapacity to consent.

court that the regulations should be characterized as "requirements relating to the [patient's] mental condition" and that their purpose is to assure that a patient has the "requisite comprehension of the nature and gravity of the operation."

CMA also claims that the department has no *implied* regulatory authority to adopt informed consent regulations. The claim is premised upon a singular reading of the regulatory statutes, that the department's regulatory authority is limited to the kind contained in section 208, which authorizes the adoption of regulations "for the execution of [the department's] duties." CMA reads "duties" as encompassing only authority which is expressly conferred.

We do not concur in CMA's diagnosis of terminal regulatory anemia. Rather, an examination of the hospital licensing statutes reveals a robust regulatory scheme. The linchpin of the scheme is section 1275. (*Ante*, fn. 7.) It authorizes the adoption of reasonable rules not only to enable the department "to perform the *duties* conferred upon it" (see also § 208), but also to "exercise [its] *powers*." It also sanctions "regulations . . . necessary *or* proper to carry out the *purposes and intent*" of the hospital licensing statutes. (Italics added.) Plainly, these regulatory authorizations exceed those contained in section 208.[13]

We read section 1275's grant of regulatory authority to aid the exercise of the department's "powers" as extending to the license revocation provisions of sections 1277 and 1294 and as fulfilling a salutary public purpose. The use of rule-making authority to define the generalized subjects of disciplinary action is superior to the piecemeal case-by-case approach of quasi-adjudicative procedures in defining, in advance of discipline, conduct which is proscribed and in thus avoiding the occasion for revelatory discipline.

Section 1294 provides for hospital license discipline for "[c]onduct inimical to the public health . . . in the . . . operation of [hospital] services. . . ." This provision imports the meaning of a "well defined phrase at common law" ("act injurious to the public health") which was "specifically directed toward . . . unnecessary operations" performed for an improper purpose. (*People* v. *Rehman* (1967) 253 Cal.App.2d 119, 153-154 [61 Cal.Rptr. 65].) Section 1275 authorizes the adoption of

---

[13]Since we look to the regulatory statutes, we have no occasion to examine the scope of section 208's "duties."

reasonable regulations in aid of preventing unnecessary operations made the subject of disciplinary action of section 1294. A similar authority appears to be granted by section 1276 which *directs* the adoption of regulations which "shall prescribe standards ... of *services, based on* the type of health facility and *the needs of the persons served thereby.*" (Italics added.) Unnecessary operations manifestly do not further the "needs of persons" served by hospitals.[14]

We hold that section 1275, together with sections 1276 and 1294, authorize the department to adopt reasonable regulations regarding "unnecessary operations." These sections supply the authority for the adoption of regulations consistent with the legislative concerns of section 1258 regarding sterilization operations. The informed consent regulations are reasonably adapted to the end of preventing unwanted or unconsented to, and hence "unnecessary,"[15] sterilization operations.

We hold the informed consent regulations are proper and reasonably in aid of the department's power to revoke the licenses of hospitals which countenance unnecessary surgery.[16]

## II

CMA urges that the department's assertion of rule-making authority over informed consent invades the responsibility of the Board of

---

[14]CMA reads the "standards of services" referred to as "standards by which to judge whether to license a facility for the provision of either 'basic' or 'special' services." However, regulatory standards for "special services" are elsewhere expressly provided for (§ 1255) as are "basic" services (§ 1250.1). We see no reason to read section 1276 as a mere duplicate of this regulatory authority.

[15]Given a legislative concern for patient rights, an unwanted operation is plainly unnecessary.

[16]CMA also advances an argument going to legislative intent. It points out that in the period between the first public hearings held by the department in May 1975 and its promulgation of the challenged regulations in May 1977, two bills were introduced in the Legislature which would have established informed consent standards for sterilizations (1976 Reg. Sess. Sen. Bill No. 1673, introd. Mar. 1, 1976 (Sen. Holden); 1977 Reg. Sess. Sen. Bill No. 52, introd. Dec. 16, 1976 (Sen. Holden), but neither was enacted. The inferential value of the Legislature's failure to enact the bills is vanishingly small. "The [bills] may have failed because the legislature felt [them] unnecessary to accomplish the result intended. [They] may have died for any of the multitude of reasons other than consideration on the merits that exist for the failure of measures to pass." (*Burgess v. Board of Education* (1974) 41 Cal.App.3d 571, 581 [116 Cal.Rptr. 183]; contrast *Cooper v. Swoap* (1974) 11 Cal.3d 856, 863-864 [115 Cal.Rptr. 1, 524 P.2d 97] (Legislature rejected provision later "revived" by administrative agency in the process of enacting the authorizing statute).)

Medical Quality Assurance (Bus. & Prof. Code, § 2000 et seq.) which disciplines the conduct of physicians. However, the informed consent regulations create no jurisdictional conflict between the agencies. While they permit sanctions to be imposed against hospitals for their violation, a physician believed to be in violation of them is not subject to discipline by the department but must be reported to the board for appropriate action. (Cal. Admin. Code, tit. 22, § 70707.8[17]; and see § 51305.7.). CMA's attempt to erect a wall of separation between the jurisdictions of the two agencies which share divides an area of common concern. Just as "both hospital and physician have common concerns and comparable obligations to the patient," as counsel for CMA conceded to the trial court, so do the department and the board. We will not hypothesize a jurisdictional conflict between the department and the board where none now appears.

## III

CMA suggests that because of the fundamental nature of the patient's decision whether or not to undergo sterilization, the establishment of informed consent procedures must be left to the Legislature, which is the only appropriate body to resolve "truly fundamental issues." (*Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 376 [71 Cal.Rptr. 687, 445 P.2d 303]; *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 11 [97 Cal.Rptr. 431].) Consequently, they maintain, a narrower construction of the department's statutory rule-making authority is required to avoid raising the issue of an unconstitutional delegation of power. (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 816-818 [114 Cal.Rptr. 577, 523 P.2d 617].)

CMA's argument is based on the mistaken assumption that the presence of "fundamental rights" necessarily predicates "truly fundamental issues." Rights are "fundamental" or not based on their place in our constitutional scheme; decisions involving procreation are "fundamental" in this sense. (*Roe* v. *Wade* (1973) 410 U.S. 113, 152-153 [35 L.Ed.2d 147, 176-177, 93 S.Ct. 705].)

---

[17]Section 70707.8 provides: "Noncompliance with Sections 70707.1 through 70707.7 may result in a revocation or an involuntary suspension of the hospital's license as delineated in Section 70135. [¶] The facility shall report to the Board of Medical Quality Assurance the name of any physician who performs a sterilization procedure which was not in compliance with Sections 70707.1 through 70707.7 of this chapter."

While the importance of the interests affected may be a determinant of whether an issue is "truly fundamental," the critical question is whether the Legislature has made a basic policy decision which provides a standard or guide for the exercise of administrative discretion. We do not view the department's decision to promulgate regulations as one on a "truly fundamental issue" because of the existence of statutory standards governing the department's exercise of discretion (§§ 1258, 1275, 1276, 1294, subd. (d)) and patients' needs in regard to hospital services (§ 1276). (See *Kugler* v. *Yocum, supra,* 69 Cal.2d at pp. 376-377.) "Merely because a statute empowers an administrative agency to exercise a judgment of high order in implementing legislative policy does not mean that the agency has been given unrestricted powers." (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 529 [160 Cal.Rptr. 907].)

IV

CMA last argues that the regulations are unnecessary.[18]

CMA advances the extraordinary thesis that the hospital regulations are not "reasonably necessary" because a patient sterilized without his or her informed consent can recover damages for negligence under the rule of *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1]. The merit in the principle by which recovery for an injury is exalted over prevention of an injury wholly escapes us. We can discern nothing that is "arbitrary or capricious," in the department's preference for an approach calculated to *prevent* unconsented-to sterilizations over a tort remedy.

The trial court correctly rejected, on the ground that CMA failed to disclose its evidentiary basis, CMA's argument that the regulations are

[18]A valid regulation must be "reasonably necessary to effectuate the purpose" of the authorizing legislation. (Gov. Code, § 11342.2; *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 411 [128 Cal.Rptr. 183, 546 P.2d 687]; *Morris* v. *Williams* (1967) 67 Cal.2d 733, 749 [63 Cal.Rptr. 689, 433 P.2d 697].) "[I]n considering whether the regulation is 'reasonably necessary', ... the court will defer to the agency's expertise and will not 'superimpose its own policy judgment upon the agency in the absence of an arbitrary and capricious decision.' [Citation.]" (*Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d at p. 411; see *International Business Machines* v. *State Bd. of Equalization* (1980) 26 Cal.3d 923, 931, fn. 7 [163 Cal.Rptr. 782, 609 P.2d 1].)

too broad to be supported by the evidence adduced at the hearings, which it characterized as establishing that some abuses had occurred.[19]

The judgment is affirmed.

Regan, Acting P. J., and Reynoso, J., concurred.

---

[19]Even if the point were properly presented, we have no difficulty in sustaining the regulations as reasonably necessary. While the evidence tended to indicate a disproportionately high incidence of coercion of the poor and minorities, there was also evidence to show that abuse was not limited to such individuals. Although the bulk of the testimony concerned women, there was also testimony supporting the application of the regulations to men. There was evidence indicating that the required waiting periods might significantly diminish the incidence among sterilized women of subsequent regret that they had undergone the procedure.