[No. C007123. Third Dist. Feb. 23, 1990.]

CALIFORNIA TROUT, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY,
Respondent;
DEPARTMENT OF WATER AND POWER OF THE CITY OF
LOS ANGELES et al., Real Parties in Interest.

**COUNSEL**

Morrison & Foerster, F. Bruce Dodge, Patrick J. Flinn, Jennifer H. Small, Ashley Kiesel and Barrett W. McInerney for Petitioners.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, Peter W. Van Der Naillen and Mary E. Hackenbracht, Deputy Attorneys General, James K. Hahn, City Attorney, Edward C. Farrell, Chief Assistant City Attorney, Kenneth W. Downey, Assistant City Attorney, Kronick, Moskovitz, Tiedemann & Girard, Adolph Moskovitz, James E. Thompson, Janet K. Goldsmith, Thomas W. Birmingham and Wendy M. Fisher for Real Parties in Interest.

Best, Best & Kreiger, Arthur L. Littleworth, Gregory K. Wilkinson, Fred Vendig, Karen L. Tachiki, Victor E. Gleason and James F. Roberts as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

BLEASE, J.—In *California Trout, Inc.* v. *State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585 [255 Cal.Rptr. 184] this court directed the respondent superior court to issue appropriate writs commanding the State Water Resources Control Board (Water Board) to attach conditions to licenses which it issued the Department of Water and Power of the City of Los Angeles (L.A. Water and Power) for the appropriation of water from four streams tributary to Mono Lake. The conditions, mandated by Fish and Game Code section 5946,[1] require that, pursuant to section 5937, L.A. Water and Power release sufficient water from its dams into the streams to reestablish and maintain the fisheries which existed in them prior to its diversion of water.

The superior court allowed the Water Board to defer imposition of the conditions pending the board's establishment of the required release rates by studies, estimated to conclude in December 1992, and refused petitioners' request for interim relief. We issued an alternative writ to consider petitioners' contention that the superior court abused its discretion in countenancing this protracted disobedience of the statute. The contention has merit and we will grant the petition.

As required by our prior decision, we will direct that the Water Board immediately attach the conditions mandated by section 5946 to L.A. Water and Power's licenses. We will further direct that the superior court expeditiously consider a request by petitioners that *it* set interim release rates pending the Water Board's action. We do so in view of the Water Board's disavowal of interim authority, the request for guidance by L.A. Water and Power in fulfilling its statutory duty, the factual predicate for relief which petitioners have established, and the concurrent jurisdiction of the courts over compliance proceedings involving section 5946. In the course of the opinion we will address the arguments tendered to the superior court, including those which are not here repeated by the real parties in interest.

### This Court's Prior Decision

At the outset we incorporate the statement of facts from *California Trout, supra,* and take judicial notice of the record in that case. We refer the reader to our prior opinion for full exposition of the factual backdrop of this proceeding. We will briefly recount the gist of that opinion here.

---

[1] All references to section are to sections of the Fish and Game Code unless otherwise specified.

In *California Trout* we determined that section 5946 requires that the conditions set forth in section 5937 be applied to licenses 10191 and 10192 issued to L.A. Water and Power by the Water Board which validate the diversion of water in Mono County, by means of dams, from Rush Creek, Lee Vining Creek, Parker Creek, and Walker Creek, tributaries to Mono Lake. We concluded that, by the enactment of section 5946, the Legislature had resolved the competing claims for the beneficial use of water in these streams in favor of preservation of their fisheries. (*California Trout, supra,* 207 Cal.App.3d at pp. 622-625.) That left only the question of compliance. With respect to the appropriate remedy we said: "[T]he plaintiffs seek a writ commanding the Water Board to condition licenses 10191 and 10192 by the provisions of section 5946. We agree that application of the rule will require reduced diversions of water from the Mono Lake tributary creeks, albeit in an amount that cannot be precisely calculated on the record before us. The relief required here is limited to attachment of the appropriate conditions. We may assume that L.A. Water and Power will adhere to such conditions in the future in the same manner as if the licenses had initially contained the conditions. Whether and to what extent enforcement proceedings might be necessitated is a matter which is not before us." (*Id.* at p. 632.)

Immediately following these remarks we directed the trial court to "issue appropriate writs, commanding the Water Board to exercise its *ministerial* duty to attach the conditions required by section 5946 to [the licenses] . . . ." (207 Cal.App.3d at pp. 632-633; italics, added.) That direction, predicated upon our stated assumption of voluntary compliance, unmistakably mandated a writ commanding the Water Board to *immediately* attach the section 5946 conditions to licenses 10191 and 10192. This direction was founded upon three considerations. First, the command of section 5946 is simply to condition licenses "upon full compliance with Section 5937" and section 5937 directs that a dam owner "shall allow sufficient water at all times . . . to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam." Second, as we noted in *California Trout, supra,* 207 Cal.App.3d at pages 600-601, footnote 4, the Water Board regulations (Cal. Code Regs., tit. 23, § 782) sanction such a condition on permits for the appropriation of water, and by analogy to licenses, by a simple reiteration of the statutory directive without quantification of the amount of water required to satisfy the direction. Third, we did not anticipate the claims for delay raised on remand by the real parties in interest, since they are founded on the untenable views that the matters resolved in our prior decision may be relitigated and that the statutory command of section 5946 may be disregarded while the matter of compliance is subjected to protracted study.

## The Trial Court Proceedings

After the remittitur issued the Water Board proposed a judgment under which the writ commanded it to exercise its ministerial duty to attach the conditions required by section 5946 to the licenses and "to make and file a return to this writ at six month intervals after receipt of this writ indicating what progress you have made to comply." Petitioner National Audubon Society (Audubon) objected to the proposed judgment, asserting that "[t]he ministerial duty breached by the Water Board—the imposition of the condition in the licenses—can be obeyed simply by re-issuing the licenses with the condition that [L.A. Water and Power] obey [Fish and Game Code] section 5937. The illegality in the licenses issued in 1974 can and should be corrected without further delay." Audubon further proposed that, pending a precise determination of the flows necessary to comply with section 5937, interim flows should be ordered. Consistent with the prayer for relief in its petition, Audubon sought an order requiring that within 30 days the Water Board, in conjunction with the Department of Fish and Game, determine approximately the amount of streamflows necessary to restore and maintain the fisheries that existed in the streams prior to the diversions by L.A. Water and Power and to maintain such flows pending a final determination of the flows.

Thereafter L.A. Water and Power requested that judgment be entered as the Water Board originally requested or that a hearing be conducted on the form of the judgment. It argued that our decision did not require action within the times set in Audubon's proposed judgment, that there was no order from this court for interim flows, and no direction that the Department of Fish and Game play any role in conditioning the licenses. It further asserted (a) that an interim order was unnecessary because preliminary injunctions issued in other actions compelled releases of water sufficient to sustain existing populations of fish in the two larger creeks and (b) that the two smaller creeks "may or may not be capable, in their present condition, to sustain any fish life at all." Finally, L.A. Water and Power argued that the amount of water required for the support of fish populations in the streams is a factual determination placed in the hands of the Water Board by this court.

The Water Board next wrote to the trial court arguing that its proposed judgment be adopted. The Water Board explained that it had initiated steps to combine proceedings to condition the licenses in accord with section 5946 with proceedings to reconsider the licenses "to protect the public trust resources of the Lake." The latter proceedings stem from *National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419 [189 Cal.Rptr. 346, 658 P.2d 709] (*Audubon*). In an attachment to the letter the Water Board explained

the relationship of the matters as follows. "[T]he [*California Trout*] decision mandates the [Water Board] to require [L.A. Water and Power] to maintain minimum flows in the four Mono Lake tributaries for protection of downstream fish resources, and to determine the flows that are necessary for this purpose. . . .

" . . . . . . . . . . . . . . . . .

[¶] Since the [Water Board] is mandated to determine the tributary flows, and since this determination will affect the lake level, the [Water Board] intends to conduct a proceeding on its own motion directly to determine the level of the lake, as part of its determination of the tributary flows. In the [Water Board's] view, it would be improper to determine the tributary flows without considering the consequences of such flows upon the level of the lake. The [Water Board's] public trust authority requires consideration of *all* public trust impacts of its decisions, which in this case requires consideration both of fish needs in the tributaries and the needs of the lake itself. Because of the relationship between tributary flows and the lake level, the [Water Board] cannot properly consider the one without considering the other. In effect, the [Water Board] hopes to avoid piecemeal determination of public trust issues by considering *all* needs dependent on tributary flows. This approach is the logical consequence of the Court of Appeal decision mandating the [Water Board] to determine the tributary flows."

In the view of the Water Board, Audubon's proposed relief was inappropriate and the request for immediate insertion of conditions in the language of the statutes was "unnecessary and pointless" because it had initiated a proceeding to attach the condition in terms of quantities of water flow. The Water Board argued that the request for an order that it set interim release rates pending completion of final studies was improper because petitioners' action was cast as a writ of mandate and the relief sought was beyond its reach. It concluded that "the [Water] Board has no authority to impose interim flows upon an appropriator."

Further, the Water Board suggested that the timelines in the judgment proposed by Audubon are inconsistent with its scheme of administrative procedure. It relied upon title 23, California Code of Regulations, section 780, subdivision (a), which provides standard terms that shall be included in all water right permits issued or extended by the Water Board. Under these terms Water Board action to modify water rights is to be preceded by a hearing on specified issues, e.g., the reasonableness of the use to which the water is to be put.

The Water Board also argued that the timelines in the judgment proposed by Audubon were unrealistic because they did not permit the field

studies and analysis necessary to determine instream flow requirements. In support of that assertion the Water Board proffered the declaration of John L. Turner, an employee of the Department of Fish and Game responsible for review and evaluation of water rights projects, executed in March 1986. Turner opined that "the task of developing the requested streamflow related information should be pursued using the Instream Flow Incremental Methodology" (IFIM) and that this would require 11 to 13 months to accomplish. The Turner declaration was relied upon in the declaration of Walter Pettit, Chief of the Division of Water Rights of the Water Board. Pettit asserted that the IFIM is "the standard tool employed by state and federal agencies" for "determining quantitative instream flows to protect fishery resources." A final report on such a study was expected in the near future on Rush Creek, but the completion of the study for Lee Vining Creek was not expected until 1992 and no studies were scheduled of the two smaller creeks.

The Water Board suggested that its duty to condition the licenses implied that it had the paramount authority to determine the content of the conditions. In its view such authority was implicit in Water Code section 1243 which directs it to "take into account, whenever it is in the public interest, the amounts of water required for recreation and the preservation and enhancement of fish and wildlife resources." In a closing sally approaching double-think, the Water Board asserted that Audubon's proposal for judgment was an attempt to circumvent this court's decision in *California Trout*.

Petitioner California Trout, Inc., submitted a memorandum expressing the view that neither of the alternative judgments was adequate and that the trial court should conduct a hearing on the form of the judgment. A hearing was set for July 19, 1989.

Audubon submitted a memorandum for the most part reiterating its earlier stance. Audubon appended a draft "Mono Lake Workplan" of the Water Board setting forth a detailed schedule for proceedings which combined the issues pertaining to the license conditions with the general public trust issues relating to the Mono Lake basin. The draft proposes that joint action on the licenses would occur in December 1992. Audubon appended supporting declarations. One of its attorneys declared that he had reviewed several licenses for diversion of water that had been conditioned pursuant to section 5946 and that "[t]hey include the following provision: [¶] In accordance with the requirements of Fish and Game Code Section 5946, this license is conditioned upon full compliance with Section 5937 of the Fish and Game Code." In another declaration Darrell Wong, an associate fishery biologist with the Department of Fish and Game, stated that while IFIM studies on the creeks had not yet been completed, "other techniques are

available that would allow me to make preliminary estimates of the flows which would be acceptable to maintain desirable fisheries and aquatic habitat. These can be completed much more quickly because they do not require the extensive collection of field data required by the IFIM studies. Using these techniques, I could provide interim flow recommendations in thirty days or less." Wong also declared that the current releases of water into Lee Vining Creek are insufficient to allow enough water to reach the lower stretches of the creek to maintain a desirable fishery, that "the water can become too warm to maintain a desirable fishery as, in Rush Creek," and that with sufficient flows released into the two smaller creeks a desirable fishery could be maintained.

L.A. Water and Power also submitted a memorandum. It added to its previous arguments the claim that Audubon's proposed judgment is grounded on the erroneous assumption that the present diversions of water are illegal. In its view the question whether any water need be released into the creeks was unresolved by the opinion in *California Trout* as the factual "issue of reasonableness of water release for fish in the present context has [not] already been determined." It argued that any direction that it release water to comply with section 5946 would present a loss of previously granted rights and would require notice and hearing before the Water Board. In its view it is lawfully, although "anomal[ously]," allowed to continue to divert all of the water of the streams in derogation of section 5946 under its original permits until a license condition is imposed and that cannot be accomplished without affording it "the due process protections accorded any other water right permittee." Finally, it argued that both it and the Water Board were of the view that the Water Board had no authority to impose "interim conditions."

After considering oral argument the trial court entered a judgment and peremptory writ similar to that proposed by the Water Board, which allows L.A. Water and Power to continue to divert all of the waters of the tributary streams, pending action by the Water Board, except as might be required by the preliminary injunctions issued in other cases.

*Discussion*

I

*Introduction*

Two principal justifications are proffered for the protracted delay in complying with section 5946. The first is that the question of compliance, requiring determination of the amount of water to be released into streams

tributary to Mono Lake, should be combined with the public trust questions deriving from the *Audubon* case, *supra*, concerning the appropriate level at which Mono Lake should be maintained. We find this claim meritless because present compliance with section 5946 does not conflict with compliance with *Audubon.*

The second justification is that the Water Board has discretion to determine the release rates needed to restore the historic fish populations in the affected streams incident to imposition of the statutory conditions and therefore may delay their attachment to the licenses until completion of detailed studies. This claim is meritless because the Water Board's discretion is confined by section 5946 and there is no persuasive reason to avoid interim compliance pending further action by the board.

The only countervailing consideration not resolved by our prior opinion is L.A. Water and Power's contention, raised after issuance of the remittitur, that it cannot readily ascertain the amount of water necessary to comply with its statutory obligation. That consideration may be addressed by means of interim judicial relief.

## II

*The Remedies Entered in Other Actions Affecting Mono Lake Are of No Legal Significance*

■ Before turning to the main arguments we address the claim that petitioners cannot show prejudice from a failure to follow our directions for immediate implementation of the mandate of section 5946 because they have received equivalent relief as a result of preliminary injunctions entered in other cases. That is not and cannot be the case.

Subsequent to the entry of judgment in this case it was combined with other cases in which the public trust questions involving Mono Lake arising from the *Audubon* case are tendered. In two of those cases preliminary injunctions were issued requiring releases of water into Rush Creek and Lee Vining Creek. Apparently, under these injunctions L.A. Water and Power is compelled to release nineteen cubic feet of water per second into Rush Creek and four to five cubic feet of water per second into Lee Vining Creek. It is argued that these releases diminish the need to compel compliance with the mandate of section 5946. We disagree.

There is no basis in the record to conclude that the releases ordered are sufficient to that end. According to L.A. Water and Power, the long-term mean annual flows in Rush Creek are 85 cubic feet per second and in Lee

Vining Creek 71 cubic feet per second. From all that appears, the basis of the temporary remedies is the preservation of populations of fish which were established in portions of those streams when unusual flows of water entered the two creek beds in 1983 and 1984. No claim is made that these populations are equal to or greater than the historical carrying capacity of the entire reach of the two streams. On the contrary, Audubon contends without contradiction that the flows set by the injunctions are less than the amount required for compliance with section 5946. Lastly, it is obvious that the releases could not count as compliance with respect to the two smaller streams not affected by the injunctions.

## III

*The Discretion of the Water Board Is Limited by Statute. Correction*
*of Unreasonable Delay in Compliance With the Statutory Duty*
*Enforced by a Writ Lies Within the Remedial Power of the Court*

That brings us to the central contention of the real parties in interest, that the Water Board's proposal for delay in imposing the section 5946 conditions is consigned to its administrative discretion and hence beyond the reach of constraint by writ of mandate. As we will show, this contention implicitly reopens issues foreclosed by section 5946 and our prior decision. The purported consignment of discretion is derived in two ways. First, it is premised on the assumption that it was conferred by this court in its prior decision. That premise is patently incorrect. Second, it is premised on provisions of the Water Code and regulations which in some circumstances grant the Water Board authority to balance competing claims for the beneficial use of water and thereby determine the relative amounts of water to be allocated for the preservation and enhancement of fish and wildlife resources and other beneficial uses. That argument is foreclosed by section 5946 and our prior opinion for the reason, we are at pains to repeat, that the Legislature has already balanced the competing claims for water from the streams affected by section 5946 and determined to give priority to the preservation of their fisheries. There is no discretion in the Water Board to do other than enforce its requirements.

The real parties' substantive claims to relitigate the priority of competing uses of water from the tributary streams to Mono Lake arise in the course of their arguments regarding the scope and appropriateness of mandate as the remedy for enforcement of our decision in *California Trout*. We will consider these claims as they are revealed in this procedural context.

### A.

Real parties in interest begin with the premise that a writ of mandate is available to compel the performance of acts by an administrative agency

that are ministerial in character but cannot interfere with or control the exercise of discretion lawfully entrusted to the agency. In their view the question of the amount of water that should be released to comply with section 5946 is assigned to the Water Board and hence the question of how to go about determining that amount is assigned to its discretion. From this they conclude that the Water Board may determine that detailed fishery studies of the streams and resolution of the broader public trust questions concerning the level of Mono Lake are prerequisites to action imposing the section 5946 conditions. That, they say, precludes more rapid relief by way of mandate. The argument is unpersuasive for several reasons.

Preliminarily, the reasoning rests upon a truncated view of the scope of mandamus. ██ "[M]andamus may issue to compel the performance of a ministerial duty or to correct an abuse of discretion." (*Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 344 [124 Cal.Rptr. 513, 540 P.2d 609], fns. omitted.) ██ In the issuance of "appropriate writs, commanding the Water Board to exercise its ministerial duty to attach the conditions required by section 5946 to [the licenses in issue]" the superior court was not constrained by law to defer to a proposal of the Water Board for the improper exercise of its duty, i.e., one that would constitute an abuse of a discretion which is confined by statute. ██ Where administrative action is compelled by a writ of mandate the court that issues the writ has the necessary ancillary power to "make any orders necessary and proper for the complete enforcement of the writ." (Code Civ. Proc., § 1097; also cf. *County of Inyo* v. *City of Los Angeles* (1976) 61 Cal.App.3d 91, 95-96 [132 Cal.Rptr. 167]; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 205 [139 Cal.Rptr. 396].) Unreasonable delay in compliance with the duty enforced by the writ lies within this remedial power. (See *Newland* v. *Kizer* (1989) 209 Cal.App.3d 647, 656 [257 Cal.Rptr. 450] [mandate to adopt regulations encompasses time necessary to comply: "Upon remand the court shall take evidence on the issue of the amount of time reasonably necessary to issue such regulations and issue mandate accordingly."]) The power of the court is the same whether the issue of delay is tendered in connection with the issuance of the writ or comes to light in proceedings arising from the return.[2]

██ The question of the scope of the Water Board's discretion is a question of law. (See, e.g., *City of Sacramento* v. *Drew* (1989) 207

---

[2]Nor is the claim tenable that our prior opinion tied the hands of the respondent superior court and precluded ancillary relief. Our plain direction was to impose the statutory condition immediately in the language of section 5937. Faced with a postremittitur claim that this would lead to unfair consequences for L.A. Water and Power, the superior court had the power to make orders to accommodate this claim, as "orders necessary and proper for the complete enforcement of the writ." (Code Civ. Proc., § 1097.)

Cal.App.3d 1287, 1297-1298 [255 Cal.Rptr. 704].) ▮▮ "The scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." (*Id.* at p. 1297.) ▮▮ If that law is a statute, as here section 5946, the confines of administrative discretion are bounded by its terms and by the means available to its enforcement. "Since the Water Board has no authority to disregard [section 5946], a judicial remedy exists to require it to carry out its ministerial functions with respect to that rule. The Legislature, not the Water Board, is the superior voice in the articulation of public policy concerning the reasonableness of water allocation." (*California Trout, supra,* 207 Cal.App.3d at pp. 631-632.)

▮▮ An administrative agency has no discretion to engage in unjustified, unreasonable delay in the implementation of statutory commands. It is conceivable that explicit statutory procedural restraints could preclude administrative action by an agency without such delay. However, in such a case the duty would ordinarily devolve on the court to fashion an ancillary judicial remedy upon request. The court cannot ignore the ongoing violation of a statutory mandate on the ground that the violation will eventually be halted by untimely administrative action.

## B.

The real parties' arguments are predicated upon the view we implicitly rejected in *California Trout* that the Water Board has primary jurisdiction over the enforcement of section 5946. That cannot be the case for two reasons.

▮▮ First, as we said, section 5946 takes this case outside the purview of statutes which may allow the Water Board to balance competing beneficial uses of water and to determine the priority of use. For that reason alone the statutory procedures applicable to the balancing of competing uses by the Water Board are not applicable. (See, e.g., Wat. Code, §§ 1243, 1253, 1254, 1256, 1257.) Thus the issues to be resolved in the enforcement of section 5946 do not invoke the expertise of the Water Board in "the intricacies of water law" and "comprehensive planning" of importance to the *Audubon* court. (33 Cal.3d at p. 450.) Rather, the questions involved in reestablishing and maintaining the fisheries in the affected streams invoke the expertise of the Fish and Game Department before which there is no administrative remedy. (See Wat. Code, § 1257.5; Pub. Resources Code, §§ 10000-10004.)

▮▮ Second, as we noted in *California Trout,* the procedural authority of the Water Board to take action to carry out the mandate of section 5946

stems from section 2501, as construed in the *Audubon* case, which can be read "broadly to avoid a procedural gap." (*California Trout, supra,* 207 Cal.App.3d at p. 631.)[3] Notwithstanding this source of administrative authority, "[a] long line of decisions indicates that remedies before the Water Board are not exclusive, but that the courts have concurrent original jurisdiction." (*Audubon, supra,* 33 Cal.3d at p. 449.) Pursuant to that concurrent jurisdiction, courts may employ the Water Board as a master. (*Id.* at p. 451.) For these reasons the courts retain jurisdiction to fashion a judicial remedy for enforcement of the statutory mandate of section 5946 appropriate to the circumstances.

### C.

■ The Water Board suggests that the petitioners could not seek ancillary relief from the court because their petition sets forth an action in traditional mandamus under Code of Civil Procedure section 1085. However, the theory of pleading under California law is fact pleading. (See, e.g., 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 1, p. 47.) The petitioners, having pled and established the facts undergirding a primary right to reestablishment and maintenance of the fisheries under section 5946, the duty of L.A. Water and Power to release water to maintain the fisheries and its ongoing failure to do so, were entitled to any remedy appropriate to enforcement of the right, including interim injunctive relief. (See, e.g., *id.,* §§ 23, 29, pp. 66, 73.) That petitioners originally prayed for a different remedy does not preclude the court from granting an appropriate remedy not made the subject of the prayer. (See, e.g., *id.,* § 447, p. 491; 8 Witkin, Cal. Procedure, *supra,* Extraordinary Writs, § 215, p. 840.) That is all the more so when the reason for denying an effective remedy for which petitioners had prayed was the belated claim of L.A. Water and Power that imposition of the conditions in the statutory language would be unfair to it.

### D.

This leads us to the question whether the delay proposed by the Water Board is unreasonable. The measure of unreasonable delay varies with context. ■ Here there is no persuasive reason to delay the attachment

---

[3] As we said in *California Trout,* "section 5946 is a specific legislative rule concerning the public trust." (207 Cal.App.3d at p. 631.) In employing that classification we brought the question of jurisdiction to enforce section 5946 within the purview of the *Audubon* case. We implied in *California Trout, supra,* 207 Cal.App.3d at page 626, by a footnote reference to *Audubon,* that the doctrine of exhaustion of administrative remedies does not apply to the remedial powers of the Water Board under section 2501. Thus, the jurisdiction of the Water Board to enforce section 5946 is concurrent with the jurisdiction of the courts to act to protect the fisheries to which the section is directed. The courts may employ any appropriate judicial remedies to that end. (See *Audubon, supra,* 33 Cal.3d at pp. 451-452.)

of the conditions required by section 5946 to the L.A. Water and Power licenses which confirm its statutory duty to limit its appropriation of water from the streams affected by the licenses. Thereafter, the amount of time reasonably required for compliance with the duty thus imposed depends upon the harm resulting from the delay and the importance of the values served by delay. The harm resulting from the delay contemplated by the Water Board is that the purpose served by section 5946, the economic and ecological benefit of the stream fisheries, will be lost for several more years. The values that are served by delay are delineated by the justifications offered by the Water Board in support of its proposal. The issue is whether the proposal is warranted by these justifications. If the proposed delay is unreasonable because it is unwarranted by these justifications, it cannot be condoned on the theory that it lies within the discretion of the Water Board. (See *Newland* v. *Kizer, supra*, 209 Cal.App.3d at p. 656.)

## IV

*The Water Board's Study of Broader Public Trust Issues Pertaining to Mono Lake Does Not Justify Delay in the Implementation of the Statutory Mandate of Section 5946*

■ The Water Board implicitly contends that the delay in the imposition of conditions on the licenses is warranted by the need to integrate the question of streamflows thereby mandated with the impact of the flows upon the level of Mono Lake, which is the subject of broader public trust issues concerning the lake now before the board. As related, subsequent to our prior opinion this case was combined with several other cases regarding the public trust issues concerning Mono Lake and preliminary injunctions have been issued in those cases relating to streamflows in two of the four streams subject to section 5946.

It does appear that water released into the streams in compliance with section 5946 will affect the level of the lake. However, there is no connection between the flows required to comply with section 5946 and the level of the lake which impels a delay in releasing water in compliance with the writ. No claim has been made that a fishery in the lake lies within the ambit of section 5946. Even assuming that fish (§ 45) exist or may be planted in Mono lake which is "below" the L.A. Water and Power dams (§ 5937) and thus subject to the mandate of section 5946, we see no potential for conflict between the public trust interest in such a fishery and the public trust interest in the fisheries in the streams. No claim has been made that action advancing the public trust values in the level of the lake may require *reduction* of the amount of water released to protect the stream fisheries. No claim has been made that the effect of releases in compliance with section

5946 will be deleterious to the public trust values in the lake. Nor do we see how such a claim could be seriously maintained.

The imperilment of the scenic beauty and ecological values of Mono Lake is a result of the *diversion* of water from the streams in the Mono basin by L.A. Water and Power. (See *Audubon, supra*, 33 Cal.3d at pp. 424-425.) Diminution of the amount of diversion can only lessen the peril. The public trust value of maintenance of fisheries in the streams is necessarily convergent with the public trust values of the Mono Lake basin that are the subject of the Water Board's broader review. Both sets of values were brought into being by the natural unimpeded flow of waters in the basin through the streams and into the lake. In the case of the streams, the natural flows were brought within the statutory recognition of public trust values in section 5946. Any releases at a level less than provided by the state of nature could not pose a conflict in these values. This is not a choice between a bird in the hand and two in the bush. At worst it is a matter of a bird in the hand and another in the bush.

V

*The Desire to Set Precise Release Rates Does Not Justify Putting Off Compliance With Section 5946*

The Water Board also asserts that it has discretion to elect to study in detail the question of the precise amount of water needed to comply with our decision in *California Trout* prior to the imposition of the conditions required by section 5946. Here the question is whether the benefit of postponing action until completion of IFIM studies justifies delaying action until that time. A negative answer is compelled by law and the record before the trial court.

The Water Board's argument ultimately relies upon the bare assertion in the Turner declaration that determining the stream flow required by section 5946 "should be pursued using [that methodology]." However, there is no support in the record for an unqualified acceptance of Turner's preference. There is no such support in Pettit's declaration that "In determining quantitative instream flows to protect fishery resources, the standard tool employed by state and federal agencies is the [IFIM]." In the ordinary prediversion case there is an *existing* stream fishery to be protected. In such a case a delay in determining release rates pending completion of an IFIM study does not transgress the statutory mandate to maintain the fishery because it results in a delay in the very taking that threatens the fishery. Nor, if Turner's view is correct, is there any reason for a delay pending completion of the IFIM studies for *all* creeks. If the IFIM study is now

complete for Rush Creek, as indicated by the Pettit declaration, action should be taken with respect to that creek regardless of the pendency of studies of other creeks.

More importantly, Audubon adduced uncontradicted evidence that the amount of water required to satisfy the requirements of section 5946 could be calculated by methods other than IFIM studies within 30 days. We can only infer that the IFIM studies are preferred by Turner because they allow a more precise calculation of the amount of water needed. Counsel for the Water Board affirmed this in asserting at oral argument that the Board decided "that we need to have more than just a rough cut at what those flows should be . . . ." However, there is no showing that the gain in precision warrants a delay of years before acting to comply with section 5946. It is undeniable that a well-balanced diet is preferable to an unbalanced diet. But starvation is hardly justified by a delayed feeding, however nutritious. No water means no compliance with section 5946; imprecise compliance is immeasurably superior to no compliance.

VI

*L.A. Water and Power's Claim of a Right to a Hearing to Determine Release Rates Does Not Warrant Delay in Compliance With Section 5946*

 Real parties in interest argue that the interim relief sought by Audubon was inappropriate because the Water Board is constrained by its own regulations to impose the conditions called for in *California Trout* only after a hearing in which the parties can participate. They argue that the Water Board has no power to impose "interim conditions" pending completion of its administrative hearing proceedings. The principal thrust of this argument is that the time deadlines sought by Audubon could not be met in view of the perceived right to a hearing. The argument rests on the unexamined assumption that the Water Board could only conduct one hearing and, since it wanted to set precise release rates, the one hearing would have to wait until that could be accomplished. As we will show, this argument is groundless.

The claim of no "interim" administrative remedy is a makeweight. There is no statutory requirement that an administrative hearing be conducted before the Water Board imposes the condition directed in *California Trout,* i.e., a condition, in the language of the governing statutes, that L.A. Water and Power comply with section 5937 pursuant to section 5946. In fact just the opposite is contemplated by its own regulations. (Cal. Code Regs., tit.

23, § 782.)[4] Although the Water Board believes otherwise, there is no constraint in its regulations or elsewhere in the law which precludes it from conducting a prompt hearing addressed to enforcement of the section 5946 license conditions based on the best available data and methodology, subject to further hearing and later modification when more refined data are available. (See *Audubon, supra*, 33 Cal.3d at pp. 448-449 and its discussion of Wat. Code, § 2501.) The Water Board is not legally inflicted with "terminal regulatory anemia." (*California Medical Assn.* v. *Lackner* (1981) 124 Cal.App.3d 28, 38 [177 Cal.Rptr. 188].)

The Water Board's argument that the exercise of its discretion is confined by regulation is founded on California Code of Regulations, title 23, section 780, as amended in 1987. (Register 87, No. 10 (Jan. 16, 1987); compare former § 761, Register 78, No. 31.) By its terms it does not apply to this case, for it directs the attachment of a provision for the continuing authority of the Water Board to address common law public trust questions "in every existing permit as a condition for granting an extension of time to commence or to complete construction work or to apply the water to full beneficial use."[5] In such circumstance the attachment of the condition must be preceded by a notice and opportunity for a hearing to the affected parties. In any event, L.A. Water and Power had notice and hearing regarding the imposition of the conditions using the statutory terms in connection with the proceedings culminating in *California Trout.*

As we held in *California Trout,* section 5946 fixes the priority of the public trust in fisheries for the streams to which it applies. The real parties

---

[4] The Water Board does not refer to the specific regulation adopted to enforce section 5937. California Code of Regulations, title 23, section 782 provides that the Water Board shall provide for compliance with section 5937 by insertion of the statutory language in any permit providing for diversion of water from a stream by means of a dam if the permit does not contain a more specific provision for the protection of fish. Analogously this extends to licenses and sanctions the relief sought by Audubon.

L.A. Water and Power argues, however, that if this is done, that "placing vague and indefinite language [the language of section 5937] in the City's existing licenses . . . 'puts *all* of the [City's] water . . . at risk.' [¶] In such circumstances, it is reasonable and prudent for the Water Board to make appropriate studies before it holds hearings to determine the amount of water necessary to keep the fish below the City's dams in good condition." This claim is answered by the provision we make for interim judicial relief.

[5] These terms include, in pertinent part, the following text. "Pursuant to California Water Code Sections 100 and 275 and the common law public trust doctrine, all rights and privileges under this permit and under any license issued pursuant to thereto [*sic*]. . . . are subject to the continuing authority of the [Water Board] in accordance with law and in the interest of the public welfare to protect public trust uses . . . . [¶] . . . The continuing authority of the board also may be exercised by imposing further limitations on the diversion and use of water by the permittee in order to protect public trust uses. No action will be taken pursuant to this paragraph unless the board determines, after notice to affected parties and opportunity for hearing, that such action is consistent with California Constitution Article X, Sec. 2; is consistent with the public interest and is necessary to preserve or restore the uses protected by the public trust."

have had their day in court on that question and are foreclosed by the law of the case from its relitigation. The same is true with respect to the question of reconciling the amount of water required to sustain the prediversion carrying capacity of fish of the four streams in issue with "the public interest," an apparent reference in the regulation to the discretion assigned to the Water Board in some cases to balance the interests served by competing claims to the use of water. (See, e.g., Wat. Code, §§ 1243, 1253, 1255-1257.) Once again we say, these provisions are not applicable in this case for the balancing therein contemplated has been done by the Legislature in enacting section 5946.

That brings us to the L.A. Water and Power's claim that imposing conditions without specifying flow rates would unfairly imperil its rights because it could not readily determine the release rates needed to comply with such a condition. (Cf. fn. 4, *supra*.) This reason cannot justify the protracted delay proposed in this case. If the Water Board was of the view that something about this case warrants specifying the section 5946 conditions in terms of release rates, the matter could have been addressed without the delay entailed in the judgment it proposed. Since the issue of the amount of water was not previously adjudicated, a hearing limited to the issue of the amount of water that must be released to attain compliance with the statute would have been appropriate. However, there is nothing in the law that leads from this premise to the conclusion that section 5946 can be ignored for several years pending the outcome of the determination of streamflow rates based upon IFIM studies. There is nothing in the law which precludes the Water Board from imposing the condition as we directed, and thereafter expeditiously hearing and setting flow rates "to . . . restore the uses protected by [section 5946]" based on approximate data presently available. Once the best approximate compliance with section 5946 had been assured the Water Board could thereafter proceed with more elaborate study looking to refinement of those rates in subsequent proceedings.

At oral argument before this court counsel for L.A. Water and Power disavowed the assertion that it would fail to release water if the conditions were imposed in terms of the statutory language. According to counsel, if that occurred L. A. Water and Power would have to "think hard" about where to release the water, how much to release, and on what kind of a schedule. Counsel nonetheless insisted that imposing such a condition would not be "meaningful" without details concerning the rates of flow that would constitute compliance and said that L.A. Water and Power would like "some direction" at least regarding Walker and Parker Creeks.

The basis of this argument is the claim that the long disuse of Walker and Parker Creeks complicates the calculation of their appropriate flow rates.[6] With respect to Parker Creek the only argument appears to be that the absence of an existing fish population makes it hard to know how much water ought to be released. The answer is—enough to restore the historic fishery. We are given no reason to suppose that the methodology advanced by petitioners in the Wong declaration is unsuited to supplying an approximation of this amount. We note that in the statutory scheme by which the Water Board is to consider the means by which to protect fisheries the Department of Fish and Game is recognized as having a primary expertise. (See Wat. Code, § 1257.5; Pub. Resources Code, §§ 10000–10004.) That makes resort to its judgment peculiarly appropriate in this case.

As to Walker Creek there is the additional circumstance that there has been obliteration of the initial portion of the former channel. There is a dispute concerning the amount of work needed to rechannel waters of the creek from the point of diversion through the zone of obliteration. However, the only evidence adduced on this point is a declaration submitted by petitioners which asserts that the amount is trivial. In any event, assuming that the need to accomplish such work might warrant some delay in the release of water in Walker Creek to comply with section 5946, there is no connection between such a delay and the protracted delay countenanced by the trial court.

For the foregoing reasons, the claim of L.A. Water and Power that a statutory "anomaly" permits it to *lawfully* divert water in violation of section 5946 until it is granted due process in the amendment of its licenses is vacuous. There is no anomaly for the reason that there is no conflict between granting the process that is due and expeditious enforcement of the statute.

---

[6] To the extent that this claim is one that there is no duty to comply with section 5946 it is too little and too late. We note that this argument seems to have been abandoned by L.A. Water and Power in its oral argument before this court. When asked if it was his position that physical conditions do not permit compliance with section 5946 counsel indicated he would not "go that far." Counsel said: "I think it's a matter of getting the facts and seeing what is a reasonable thing to do." In any event, the claim there is no duty is too little because compliance with that statute can be obtained by use of the statutory means. There is no reason to suppose that cessation of diversion, i.e., a return to the natural situation, would not of itself restore the creeks and their fisheries. However, this would probably constitute a waste of water. Hence, the appropriator can be compelled as the price of continued appropriation to take reasonable steps to attain the same end in a manner that does not involve unreasonable use of water. L.A. Water and Power conceded at oral argument that it has control of the means to accomplish this. The no duty argument is too late because claims of no duty to comply with the statute should have been raised in opposition to our prior adjudication that there is such a duty.

*Relief*

That brings us to the question of remedy. As we have shown, all of the concerns raised in support of the protracted delay contemplated in the Water Board's proposal for judgment could have been accommodated by issuance of an appropriate writ conforming in substance to the petitioners' proposal. The writ should have commanded the immediate imposition of the conditions in the language of section 5937 as we directed in our previous opinion, and further could have directed that the Water Board conduct an expeditious proceeding to specify flow rates which would constitute compliance pending further refinement as appropriate. Alternatively, the respondent court could have accepted the Water Board's disavowal of authority to act with alacrity and, after issuing the writ we directed, exercised its concurrent jurisdiction over public trust matters by conducting a hearing to specify the release rates that would constitute compliance with section 5946 pending completion of the Water Board's proposed detailed studies.

The court was not constrained, in the manner of a baseball arbitration, to choose one or the other of the contending proposals for judgment. In fashioning "appropriate writs" based on the claims before it, it should have responded to petitioners' request for ancillary relief by enjoining interim compliance with section 5946 or by directing the Water Board to do so. That a hearing might be appropriate in either event does not prevent judicial relief.

The question at this juncture is what relief should we direct. The Water Board continues in its disinclination to compel prompt compliance with section 5946. The considerations that might warrant a reference (see *Audubon, supra*, 33 Cal.3d at p. 451) of more garden-variety water rights problems to the Water Board are lacking here. As we have noted, the function of balancing of the public interest between contending uses ordinarily performed by the Water Board is not applicable because the balancing has already been accomplished by the Legislature. Moreover, as related, the problem is narrowed by the fact that the requisite administrative expertise of determining the streamflows necessary to establish and maintain fisheries resides principally in the Department of Fish and Game. There is, however, no administrative remedy before that agency. In view of the history of this litigation, the positions taken by the parties, the importance of the matters in issue, and the need for prompt action, the appropriate method to obtain compliance is to specify beyond possibility of cavil that the trial court shall determine and impose interim release rates, taking into consideration the recommendations of the Department of Fish and Game.

This resolution is apparently acceptable to all the litigants. At oral argument of this matter, counsel for L.A. Water and Power has, commendably,

expressed a willingness to have such matters expeditiously resolved either before the Water Board or before the superior court, so long as there is an opportunity to be heard on the standards imposed. We see no principled grounds for opposition by the Water Board to this manner of achieving compliance with our prior opinion and with the legislative mandate of section 5946. The Water Board has no interest in objecting to an order directed to a third party and imposing no duties upon it which gains interim compliance with section 5946 and leaves it free to pursue the program which it deems appropriate to finally resolve the matters in issue. Indeed, in its latest brief before this court, the Water Board asserts that it "does not oppose any party seeking preliminary injunctive relief from the superior court." So be it.

The writ shall command immediate imposition of the conditions as we directed, leaving the question of interim streamflow rates to the trial court and the determination of the precise flow rates to the Water Board. The emergent request of L.A. Water and Power for guidance in release of the appropriate amount of water into the streams shall be accomplished pursuant to petitioner's request for expeditious relief, treating that as an application for preliminary injunctive relief, ancillary to the writ. The trial court shall specify the standard for compliance with section 5946 and direct L.A. Water and Power to adhere to that standard, pending modification of the licenses by the Water Board to specify precise flow rates.

In view of our resolution of the foregoing issues none of the other points raised by the parties require discussion except for the petitioners' request for an award of attorneys' fees in this proceeding under Code of Civil Procedure section 1021.5. Real parties in interest have made no reply to this request beyond their opposition on the merits. ■■ Since the award relates to the action initiated in this court it is appropriate that we make the determination of entitlement to such fees. ■■ Petitioners have, by this action, conferred a significant benefit on the general public; the necessity and financial burden of private enforcement is such as to make the award appropriate; there is no recovery from which such fees may be paid. We therefore hold that petitioners are entitled to attorneys' fees for this proceeding and for all proceedings required to enforce the writ and we will direct the trial court to determine the amount of fees to be awarded which they have and will have incurred. The fees, together with the costs of this proceeding, shall be the joint and several liability of both real parties in interest.

*Disposition*

Let a peremptory writ of mandate issue directing respondent superior court to vacate the judgment in Sacramento Superior Court action numbers

336712 and 336715, upon issuance of the remittitur to promptly issue a writ commanding the Water Board to exercise its ministerial duty without further delay to attach the following conditions to licenses 10191 and 10192: "In accordance with the requirements of Fish and Game Code section 5946, this license is conditioned upon full compliance with section 5937 of the Fish and Game Code. The licensee shall release sufficient water into the streams from its dams to reestablish and maintain the fisheries which existed in them prior to its diversion of water." In addition, the superior court shall entertain and expeditiously resolve an application by the petitioners for injunctive relief, pending the establishment and implementation of release rates by the Water Board and any proceedings for review and enforcement of the rates, in the form of interim releases of water into the streams affected by the licenses sufficient to accomplish compliance with the statutory mandate. Pursuant to Code of Civil Procedure section 1021.5, the court shall also determine the amount of attorneys' fees to be awarded petitioners for this writ proceeding and the ensuing interim injunctive relief proceedings.

Puglia, P. J., and Evans, J., concurred.