**NATURAL RESOURCES DEFENSE COUNCIL, et al., Plaintiffs,**

v.

**Roger PATTERSON, etc., et al., Defendants.**

**No. CIV.S–88–1658 LKK.**

United States District Court, E.D. California.

Aug. 27, 2004.

Michael E. Wall, Hamilton Candee, Jared Huffman, Natural Resources Defense Council, Philip F. Atkins–Patterson, Sheppard Mullin Richter and Hampton, Fred H. Altshuler, Adam B. Wolf, Altshuler Berzon Nussbaum Rubin & Dermain, San Francisco, CA, for Plaintiffs.

U.S. Attorney, United States Attorney, Sacramento, CA, Eileen Sobeck, Washington, DC, Gregory K. Wilkinson, Best Best and Krieger, Riverside, CA, K. Jack Haugrud, Washington, DC, Maria A. Iizuka, Sacramento, CA, Gary W. Sawyers, Law Offices of Gary W. Sawyers, Fresno, CA, John L. Marshall, Jason Cohen, Washington, DC, for defendants.

## ORDER

KARLTON, Senior District Judge.

This matter comes before the court on plaintiffs' motion for summary adjudication as to liability on their claim under § 8 of the Reclamation Act of 1902. Plaintiffs allege that since the late 1940s, the Department of Interior's Bureau of Reclamation has failed to release the amount of water through the Friant Dam required to keep the San Joaquin River historic fisheries in good condition. The Friant defendants and the Chowchilla Water District bring cross-motions for summary adjudication and for dismissal in which the Madera Irrigation District joins. California's State Water Resources Control Board (SWRCB), the Central Delta Water Agency and South Delta Water Agency, and Waterkeepers Northern California and Deltakeeper, have all filed *amicus* briefs in favor of plaintiffs' motion and in opposition to the Friant defendants' motion.[1]

## I.

## UNDISPUTED FACTS

### A. THE SAN JOAQUIN RIVER BEFORE FRIANT DAM

The San Joaquin River is the main artery of California's second largest river system. The river originates high in the Sierra Nevada mountains, on mountain peaks southeast of Yosemite National Park, and then tumbles westward out of the mountains and into the trough of the Central Valley. Near the city of Mendota, the River turns abruptly north for the final stretch of its several hundred mile journey, picking up the Merced, Tuolumne, Stanislaus, Mokelumne, Calaveras, and Cosumnes Rivers as major tributaries on the way. It finally merges with the Sacramento River to form the San Francisco Bay–Delta estuary.

Historically, the San Joaquin River supported substantial populations of Chinook salmon, including both a fall and a spring run (Decl. of Peter Moyle, Exh. F, at 16). Chinook are distinguishable from other species of Pacific salmon by their large size and unique markings. They are an anadromous species, which means that they emerge and rear in freshwater tributaries, migrate to the ocean as juveniles, and return to their natal waters to spawn two to four years later. The San Joaquin River's adult spring-run Chinook historically returned to the River mostly during the months of March through June, and spent the summer holding in deep pools above and below the existing location of

---

1. The federal defendants have filed a "Motion that the Court Deny Plaintiffs' Motion for Summary Judgment." The court construes defendants' motion as an opposition to plaintiffs' motion.

Friant Dam. Spring-run would then spawn in the early fall, and their offspring would migrate out to the sea the following year, generally from January to March. Historically, the adult fall-run Chinook returned to the river mostly between September and December, and spawned soon thereafter. Fall-run juveniles would emerge in late winter and migrate out to the sea primarily in the months of March through May.

Salmon on the San Joaquin River were abundant prior to the closure of Friant Dam (Moyle Decl., ¶ 1; Decl. of Amy Macaux, Exh. F, at 16). The river's spring run was one of the largest Chinook runs anywhere on the Pacific Coast and has been estimated at several hundred thousand fish (Moyle Decl., ¶ 20; Macaux Decl., Exh. G, at 9; Macaux Decl., Exh. F, at 8). The historical fall run is conservatively estimated to have numbered 50,000 to 100,000 fish. So many salmon migrated up the San Joaquin River during the spawning season that some people who lived near the present site of Friant Dam compared the noise to a waterfall. Some residents even said that they were kept awake nights by the myriad salmon heard nightly splashing over the sand bars in the River. One observer reported that salmon were so plentiful that ranchers trapped the fish and fed them to hogs. A fisherman who lived downstream recalls that, in the 1940s, the salmon were still "so thick that we could have pitch-forked them. One almost could have walked across the River on the backs of the salmon when they were running." (Decl. of John Banks, ¶ 5).

The upper San Joaquin River contained Chinook habitat both above and below the location of Friant Dam, including some of the best spring-run habitat anywhere in California. This included a mixture of deep pools for holding and gravelly riffles for spawning, over which cold water ran. (Moyle Decl., ¶ 19). Much of that habitat

still survives in the River below Friant Dam. (*Id.*) Other anadromous fish, including Pacific lamprey and steelhead, once lived on the San Joaquin River below Friant Dam as well. (Moyle Decl., ¶ 22; Macaux Decl., Exh. G, at 1,9; Wall Decl., Exh. B., at 29–32). Collections of fish made in the vicinity of Friant in 1898 and 1934 indicate that the River supported diverse native fish that included rainbow trout, splittail, hitch, hardhead, and Kern brook lamprey, all species of conservation interest today. The river's flow into the Delta also helped support that important ecosystem's water quality and habitat. In 1999, the National Marine Fisheries Service designated the San Joaquin River between Friant Dam and the Merced as "essential fish habitat" for Chinook salmon, pursuant to the Magnuson–Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–83 (Decl. of Michael E. Wall, Exh. A; RJN, Exh. A).

## B. THE BUILDING OF FRIANT DAM

The Bureau built Friant Dam across the upper San Joaquin River, northwest of Fresno, in the early 1940s as part of the Central Valley Project. Construction began in 1939 and was largely completed by the mid–1940's. The Dam stores the river's flow in Millerton Lake, the reservoir behind the Dam, and diverts water for irrigation and other purposes into two canals. The first of these, the Madera Canal, was completed in 1945. The second, the Friant–Kern Canal, began delivering water by 1949. Since that time, the Bureau has operated Friant Dam to maximize the quantity of water diverted to its Friant Division contractors, including the non-federal defendants.

Friant Dam blocked upstream access to a portion of the San Joaquin River's spawning habitat for salmon and steelhead; however, it was not the construction

of the Dam that terminated the salmon runs. For several years after Friant Dam was in place, the Bureau released sufficient water to sustain the salmon fishery. Chinook salmon are a remarkably resilient species, and although Friant Dam blocked passage to upstream habitat, during the first years after the Dam was built, spring-run Chinook successfully held in pools below Friant Dam during the summer months, adults successfully spawned in habitat below the Dam, and juveniles continued to migrate downstream. In one of these years, 1945, an estimated 56,000 spring-run returned to spawn below Friant Dam. While the upper San Joaquin's salmon runs were not as strong as they once were, Professor G.H. Clark, of Stanford University, reported that the fish themselves were "in excellent shape" in 1942 (Decl. of Adam Wolf, Exh. F).

By the late 1940s, however, the Bureau's operation of Friant Dam had caused long stretches of the River to dry up. (Macaux Decl., Exh. F, at 18). In the spring of 1948, the California Division of Fish and Game responded with a dramatic fish rescue in an attempt to save the River's spring-run Chinook salmon. About 2,000 up-migrating Chinook were trapped in the lower portion of the River, hauled by truck around the dewatered stretch of the River, and released at a point from which they could migrate upstream to deep pools just below Friant Dam. These salmon were able to hold over the summer in these pools, and to spawn successfully below Friant Dam in the fall, but their offspring perished in early 1949 when they attempted to out-migrate through the dried-up River bed.

With the completion of the Friant–Kern Canal, the Bureau in 1949 further increased diversions, leaving even less water for the San Joaquin River. (Moyle Decl., ¶ 31; Macaux Decl., Exh. J, at 6). The last of the upper San Joaquin River's fall-run Chinook salmon were reported in a pool below Mendota Dam in 1949. (Loudermilk Decl., Exh. K). Spring-run Chinook salmon disappeared from the San Joaquin River after unsuccessful salmon rescue attempts in 1949 and 1950. (Moyle Decl., ¶ 39; Macaux Decl., Exh. F., at 18; Macaux Decl., Exh. G, at 9). For most of the last 50 years, the Bureau has diverted virtually all of the River's flows. (Macaux Decl., Exh. J, at 6; Macaux Decl., Exh. K, at 3; Moyle Decl., ¶¶ 22–28, 31; Loudermilk Decl., ¶ 2). While salmon continued to return and spawn until 1949, after that, "the San Joaquin chinook was extirpated in its southernmost range." (Macaux Decl., Ex F, at 18).

Some sixty miles of the River upstream of its confluence with the Merced now lie continuously dry, except during rare flood events. (Macaux Decl., Exh. E, at 7; Macaux Decl., Exh. K, at 3; Wall Decl., Exh. B, at 43; Loudermilk Decl., ¶ 2). The spring-run Chinook—once the most abundant race of salmon in the Central Valley—appear to have been extirpated from the length of the River. (Wall Decl., Exh. B, at 36, 42, 48; Macaux Decl., Exh. H, at 9). Small populations survive only in the Sacramento River system. (Moyle Decl., ¶¶ 26, 29). The fall-run Chinook, too, were eliminated from the upper San Joaquin River, although reduced populations of fall-run Chinook survive on downstream tributaries, principally the Merced, Tuolumne, and Stanislaus Rivers. (Moyle Decl., ¶ 27; Wall Decl., Exh. B, at 36, 42, 48; Macaux Decl., Exh J at 6). In the words of the Department of the Interior, Friant Dam's operations have been a "disaster" for Chinook salmon. United States Dep't of the Interior, *The Relationship Between Instream Flow, Adult Immigration, and Spawning Habitat Availability for Fall–Run Chinook Salmon in the Upper San Joaquin River, California* at 6 (Sept.1994) (Macaux Decl., Exh. J).

Despite the upper San Joaquin River's degraded habitat and long stretches of normally dry river bed, salmon and Pacific lamprey have returned to the upper San Joaquin River in wet years, even after Friant Dam began full storage and diversion operations. Part of Chinook salmon's natural behavior includes establishing or re-establishing themselves in new streams and rivers by "straying" from their natal waters. (Moyle Decl., ¶ 33). In some years, salmon have made it to the base of Friant Dam. (Moyle Decl., ¶ 33; Macaux Decl., Exh. G, at 10). Adequate flows of water have not been released from Friant Dam for these up-migrating salmon to spawn, however, or for their offspring to migrate back to the sea. (Moyle Decl., ¶ 33; Loudermilk Decl., ¶ 2; Wall Decl., Exh. B, at 29, 35–36).

The Bureau's operation of Friant Dam has also contributed significantly to declines in other native fish throughout the San Joaquin River system. (Moyle Decl., ¶ 22, 31; Macaux Decl., Exh. G, at 1–2; Wall Decl., Exh. B, at 42–43). Following the construction of Friant Dam, ten of the sixteen species of native fish disappeared from the area. (Moyle Decl., ¶ 22; Macaux Decl., Exh. G, at 1–2). They were replaced, in the reaches where enough water for any fish still exists, primarily by a variety of non-native fishes. (Moyle Decl., ¶ 22; Macaux Decl., Exh. E, at 6–7).

Waters from the upper San Joaquin had been critical to providing habitat for fish species many miles below the Dam. (Moyle Decl., ¶ 31; Macaux Decl., Exh. G, at 1). San Joaquin River flows are needed to help attract adult salmon to their spawning grounds, to provide habitat for young and juvenile salmon, to move juvenile salmon downstream in the spring through the lower San Joaquin River, and to provide sufficient dilution of toxic and saline drainage to maintain a minimum level of water quality. (Moyle Decl., ¶ 31; Macaux Decl., Exh. E, at 10). Failure to release water from Friant Dam has rendered many miles of fish habitat unusable, especially in the stretch between the Dam and the river's confluence with the Merced, and has also adversely affected water quality along the whole course of the river. (Moyle Decl., ¶ 31; Macaux Decl., Exh. G, at 1, 2; Wall Decl., Exh. B, at 44, 46). Today, the first several miles of the San Joaquin River deep water ship channel, near Stockton, experience dissolved oxygen levels that are so low during summer and fall months that they do not meet the state water quality objective. (Wall Decl., Exh. C, at 1). Low dissolved oxygen in these reaches poses a danger to fish generally, and a migration barrier to anadromous fish, including salmon in particular. Id.

Reduced flows in the San Joaquin below Friant Dam have diminished the area available for fish, increased the temperature of the water that is available, reduced the ability of the river to assimilate agricultural runoff and other pollutants, and substantially degraded riparian vegetation. (Moyle Decl., ¶ 31; Wall Decl., Exh. B, at 46; Macaux Decl., Exh. G, at 6). Native fishes such as hitch, splittail, tule perch, and pikeminnow, have largely disappeared from the River and have been replaced by exotic fishes tolerant of warm polluted water. PSUF 66. The present warm-water fishery that exists on portions of the San Joaquin River between Mendota Pool and the San Joaquin's confluence with the Merced River is small and erratic. (Moyle Decl., ¶ 32). Many of the fish in this reach are contaminated with pesticides and other agricultural contaminants. (Moyle Decl., ¶ 31; Wall Decl., Exh. B., at 35). From Mendota Pool to Sack Dam, the river is basically used to convey irrigation water, and from Sack Dam to the river's confluence with the Merced River, the river is dewatered for forty miles until agricultural drain water provides a small flow that is a

highly degraded environment for fish. (Moyle Decl., ¶ 31; Macaux Decl., Exh. G, at 6). Surveys by the U.S. Geological Survey indicate that the fish in this polluted section of the river are almost entirely pollution-tolerant non-native fishes, such as common carp, red shiners, bluegill, and mosquito fish (Macaux Decl., ¶ 32). The native fish have largely disappeared.

## II.

## SUMMARY ADJUDICATION STANDARDS

Summary adjudication, or partial summary judgment "upon all or any part of a claim," is appropriate where there is no genuine issue of material fact as to that portion of the claim. *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim") (citations omitted); *Playboy Enters., Inc. v. Welles, Inc.*, 78 F.Supp.2d 1066, 1073 (S.D.Cal.1999), *aff'd in part, rev'd in part, on other grounds*, 279 F.3d 796 (9th Cir.2002); E.D. Local Rule 56–260(f).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.*

Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *See also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Sicor Limited*, 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *See also First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. 1575; *Rand v. Rowland*, 154 F.3d 952, 954 (9th Cir.1998). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Owens v. Local No.*

169, *Assoc. of Western Pulp and Paper Workers,* 971 F.2d 347, 355 (9th Cir.1992) (quoting *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505; *see also Cline v. Industrial Maintenance Engineering & Contracting Co.,* 200 F.3d 1223, 1228 (9th Cir.2000).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank,* 391 U.S. at 290, 88 S.Ct. 1575; *See also T.W. Elec. Serv.,* 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *see also International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.,* 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *See also In re Citric Acid Litigation,* 191 F.3d 1090, 1093

(9th Cir.1999). The evidence of the opposing party·is to be believed, *see Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *see Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)(*per curiam* )); *See also Headwaters Forest Defense v. County of Humboldt,* 211 F.3d 1121, 1132 (9th Cir. 2000). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal. 1985), *aff'd,* 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is·some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

### III.

### ANALYSIS

### A. INTRODUCTION

As this court has previously held, and as explained in greater detail below, § 8 of the Reclamation Act of 1902,[2] makes California Fish and Game Code § 5937[3] appli-

---

**2.** Section 8 provides:

Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this

Act,·shall proceed in conformity with such laws ….

43 U.S·C. § 383.

**3.** That statute provides:

The owner of any dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam.

cable to the federal defendants in this case. Plaintiffs' first claim is premised on § 5937. Plaintiffs allege that the Bureau of Reclamation, since the 1940's, has failed to "allow sufficient water" to "pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam."

In *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), the Supreme Court explained that the "cooperative federalism" mandated by § 8 required the United States to comply with state water laws unless that law was directly inconsistent with clear congressional directives regarding the project. *Id.* at 650, 678, 98 S.Ct. 2985; *see id.* at 653, 98 S.Ct. 2985 ("The history of the relationship between the Federal Government and the States in the reclamation of the arid lands of the Western States is both long and involved, but through it runs the consistent threat of purposeful and continued deference to state water law by Congress."). Thus, absent displacement by another federal statute, § 8 requires the Bureau of Reclamation to comply with § 5937. *See NRDC v. Houston,* 146 F.3d 1118, 1132 (9th Cir.1998).

In their motion for summary adjudication, plaintiffs ask this court to find that the federal defendants have violated § 8 and § 5937, but to reserve the question of remedy for a subsequent phase of the litigation.

In their oppositions to plaintiffs' motion, and in their own motions, the defendants argue, *inter alia,* that (1) plaintiffs lack standing (2) the court lacks subject matter jurisdiction to entertain plaintiffs' claim under the Administrative Procedure Act, (3) the State Water Resources Board has addressed the issue and the Board's decision is entitled to preclusive effect, and (4)

Cal. Fish and Game Code § 5937.

plaintiffs' claim is preempted by the Central Valley Project Improvement Act.

This litigation was commenced in 1988. While much of that time was taken up by efforts to reach a good faith settlement, this court has invested a substantial amount of time over the past fifteen years resolving the many subtle and complex legal issues raised by this lawsuit and by the § 8/ § 5937 claim in particular. Many of the arguments raised by the defendants have been previously litigated and have resulted in decisions, both by this court and by the U.S. Court of Appeals for the Ninth Circuit. In that regard, the court has previously warned the parties against continually relitigating such issues. *See* Status (Pretrial Scheduling) Order filed Sept. 27, 1995, at 2 (admonishing the parties not to include "disguised motions to reconsider legal issues this court has already decided" in their summary judgment motions). Unfortunately, that admonition has not affected the defendants' conduct. I thus now must reiterate that the court's previous rulings are law of the case, and may not now be reopened or relitigated. *See, e.g., Pit River Home & Agric. Co-op. v. United States,* 30 F.3d 1088, 1096–97 (9th Cir.1994) (holding that "[t]he law of the case rule ordinarily precludes a court from re-examining an issue previously decided by the same court, or a higher appellate court, in the same case" (internal quote marks and citations omitted)); *see also Vizcaino v. United States Dist. Ct.,* 173 F.3d 713, 719 (9th Cir.1999) (explaining that, under the law of the case doctrine, parties may not relitigate issues that either have been previously decided in the same case or that the parties "have already had a fair opportunity to contest"). In sum, where an issue has been decided, the court will not revisit the question unless changed law or circumstances warrant it.

## B.  STANDING AND SUBJECT MATTER JURISDICTION

### 1.  *Article III Standing*

Defendants' challenge to plaintiffs' Article III standing is effectively foreclosed by the law of the case doctrine.  In January 1992, the defendants moved to dismiss the plaintiffs' § 8/ § 5937 claim.  Among other contentions, the federal defendants asserted that "the plaintiffs lack standing to bring this claim because their alleged injury does not fall within the zone of interest [*sic* ] protected by Section 8." Fed. Defs.' Mem. in Supp. of Mot. to Dismiss Plfs.' 4th Claim at 1–2 (filed Jan. 6, 1992).

In a published order filed on April 30, 1992, this court denied the defendants' motions to dismiss, finding that the plaintiffs have both constitutional and statutory standing to enforce § 8 and § 5937. *See NRDC v. Patterson*, 791 F.Supp. at 1425, 1430–31 (E.D.Cal.1992).  I explained that "[p]laintiffs' groups are composed of would-be users of the water and water-generated resources that would result if the Bureau were required to [comply] ... with the provisions of § 5937," that the plaintiffs had alleged an injury in fact, and that the plaintiffs "plainly" fell within the zone of interests implicated by § 8 and § 5937.  *Id.* at 1429–31.  There has been no change in facts or circumstances that warrants revising the 1992 conclusions.[4] The undisputed facts establish that plaintiffs have standing with respect to their first claim, and the court's previous finding with respect to standing is therefore confirmed.

### 2.  *Judicial Review under the APA*

██  Plaintiffs' first claim is brought pursuant to § 706(1) of the Administrative Procedure Act ("APA"), which authorizes claims to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Both the federal defendants and the Friant defendants argue that this court lacks subject matter to hear plaintiffs' claim because, under the Supreme Court's recent decision in *Norton v. Southern Utah Wilderness Alliance*, —— U.S. ——, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (*"SUWA"*), § 706(1) does not authorize judicial review of claims such as those at bar.

In *SUWA*, various environmental groups brought suit under § 706(1), alleging that the Bureau of Land Management (BLM) failed to act to protect Utah public lands from environmental damage caused by off-road vehicles.  The High Court held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*"  —— U.S. at ——, 124 S.Ct. at 2379 (emphasis in original).  "The limitation to discrete agency action," the Court explained, "precludes the kind of broad programmatic attack we rejected in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)."  —— U.S. at ——–——, 124 S.Ct. at 2379–80.[5]  "The limitation to *re-*

---

4.  The defendants' disregard of the court's order has caused plaintiffs to submit additional affidavits demonstrating standing on the part of current individual members of plaintiff organizations.  *See, e.g.,* Decl. of Barry Nelson, ¶¶ 6–9; Decl. of John Banks, ¶¶ 9–10; Decl. of Nick Di Croce, ¶¶ 4–5.

5.  In *National Wildlife Federation*, the Court considered a challenge to BLM's land withdrawal review program, which the plaintiff

cast as unlawful agency "action" that should be "set aside" under § 706(2) of the APA. The Court rejected this challenge, explaining that the plaintiff "cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.  Under the terms of the APA, [plaintiff] must direct its attack against some particular 'agency action'

*quired* agency action rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 2380.

The Friant and federal defendants contend that the limitations addressed in *SUWA* bar the § 8/ § 5937 claim at issue here. Evaluation of this argument requires a comparison of the sort of "broad programmatic attack" rejected in *National Wildlife Federation* and *SUWA,* and in Ninth Circuit cases applying the same principles, with the claim at issue here.

In *SUWA,* the plaintiffs alleged three different failures to act on the part of the BLM, premised on different statutory and regulatory provisions. First, the plaintiffs claimed that the BLM had violated a statute requiring the Secretary of the Interior to manage certain wilderness study areas "so as not to impair the[ir] suitability for preservation as wilderness." 43 U.S.C. § 1782(c). The Court found that the statute was "mandatory as to the object to be achieved, but it leaves to BLM a great deal of discretion in deciding how to achieve it." Such an alleged general deficiency in compliance, the Court held, lacked the requisite specificity. Slip op. at 9–11. Second, the plaintiffs claimed that the BLM's failure to comply with provisions of its land use plans contravened the requirement that the Secretary of the Interior manage public lands in accordance with such plans. 43 U.S.C. § 1732(a). This claim was not actionable, the Court reasoned, because a land use plan, unlike a specific statutory command, is generally a statement of priorities; it guides and restrains actions, but

does not prescribe them. Thus, such statements are not legally binding commitments enforceable under § 706(1). Slip op. at 11–16. Third, the plaintiffs in *SUWA* argued that the BLM failed to fulfill certain obligations under the National Environmental Protection Act ("NEPA"); the Court disposed of this claim without resort to the principles at issue here.

The limitations described in *SUWA* and *Lujan* are important ones. They are designed to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 10. They are, however, simply inapplicable here. Directly put, § 8 requires the Secretary to "proceed in conformity" with the relevant state laws, 43 U.S.C. § 383, and the relevant state law here directs the Bureau to release sufficient water to "reestablish and maintain" the "historic fisheries." *CalTrout II,* 218 Cal.App.3d at 210, 213, 266 Cal.Rptr. 788. This kind of specific legal duty is a far cry from the general statutory directive that the government endeavor to manage certain of its lands "so as not to impair the[ir] suitability for preservation as wilderness." 43 U.S.C. § 1782(c). Rather, the "plaintiff[s] assert that an agency failed to take a *discrete* agency action that it is *required to take.*" *SUWA,* —— U.S. at ——, 124 S.Ct. at 2379 (emphasis in original). The Court's decision in *SUWA,* therefore, does not affect the plaintiffs' claim, which is that the federal defendants' failure to comply with § 5937's command is actionable under APA § 706.[6]

---

that causes it harm.". *National Wildlife Federation,* 497 U.S. at 891, 110 S.Ct. 3177.

**6.** In their supplemental letter briefs, the parties argue over the precise scope of the limitation on APA § 706(1) challenges announced in *SUWA.* The federal defendants' letter brief cites *ONRC Action v. Bureau of Land Management,* 150 F.3d 1132 (9th Cir.1998), for the proposition that plaintiffs must "point to a

deliberate decision by [the agency] to act or not to take action." *Id.* at 1137; *Sierra Club v. Peterson,* 228 F.3d 559, 569 (5th Cir.2000) ("Under the APA, the district court only had jurisdiction over challenges to identifiable final agency actions."). This argument, while quite interesting, seems to have little to do with the matter at bar. Here, the plaintiffs have pointed to a specific statutory require-

## C. APPLICABILITY OF SECTION 5937 TO FRIANT DAM

The federal defendants once again argue that § 5937 does not apply to the Friant Dam. In their January 1992 motion to dismiss, the federal defendants also argued that § 5937 "does not apply to Friant Dam" as a matter of state law, that § 5937 "is inconsistent with clear Congressional directives and thus may not be applied to Friant Dam," and that "[s]ection 5937 is simply not a statute that is included within Section 8's mandate." Fed. Defs.' Mem. in Supp. of Mot. to Dismiss Plfs.' 4th Claim at 1, 2, 10 (filed Jan. 6, 1992). In a parallel motion, the non-federal defendants likewise argued that § 5937 "is not one of the laws to which Congress directed or intended that the [Bureau] comply when carrying out its responsibilities under the 1902 Federal Reclamation Act," and urged the court to "invoke the abstention doctrine to stay further federal court proceedings." Non–Fed. Defs.' Mot. to Dismiss Plfs.' 4th Claim at 1, 19 (filed Jan. 6, 1992); Non–Fed. Defs.' Reply to Opp. to Mot. to Dismiss Plfs.' 4th Claim at 10 (filed Feb. 21, 1992). This court's April 1992 published order rejected these arguments, holding that § 5937 "relates to the control, appropriation, use or distribution of water used in irrigation," and therefore that the state statute "must be held to be within the purview of state laws made applicable to the Bureau through Section 8 [of the Reclamation Act of 1902.]" *Patterson*, 791 F.Supp. at 1433, 1435. "Section 8," this Court squarely held, "mandates compliance with the state statute." *Id.* at 1435. Defendants have identified no change in facts or circumstances that warrants revisiting the court's prior ruling.

## D. WHETHER § 5937 ESTABLISHES ALTERNATIVE REQUIREMENTS

█ ·Section 5937 provides that "[t]he owner of any· dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam." The Friant defendants argue that this language sets forth alternative requirements for the release of water. The phrase "any fish that may be planted or exist below the dam," they contend, when given its usual, ordinary, meaning, should be read to require a dam owner to release enough water from the dam to "keep"—that is, to maintain in good condition—*either* "any fish that may be planted" *or*, in the alternative, "any fish that may ... exist below the dam." Plaintiffs, they argue, improperly read "any" as if it meant "all," and "or" as if it meant "and." Defendants cite case law which stands for the proposition that the word "or" in a statute must be read in the disjunctive, i.e., the word indicates the legislature's intention to designate alternative categories. *See, e.g., Wards Cove Packing Corp. v. National Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir.2002) ("This language is clear and unambiguous. It provides that a person that made a legal landing of either halibut or sablefish is qualified to receive an initial QS ... Under the plain language of Subsection (a)(2), any owner of a fixed gear vessel who made a legal landing of either 'halibut or sablefish' in the regulated area in 1988, 1989 or 1990 is qualified to receive an initial QS in 'halibut and sablefish.' ") (interpreting meaning of word "or" in 50 C.F.R. § 679.40(a)(2));

ment, § 8 incorporating § 5937, which they assert requires the Government to release sufficient water to keep the fish in good condition. In addition, they point to specific, albeit repeated, instances in which the government

decided not to act, i.e. not to release sufficient water to keep the fish in good condition. Thus, it appears clear that this court possesses jurisdiction over plaintiffs' claim.

*Piscioneri v. City of Ontario,* 95 Cal. App.4th 1037, 1044, 116 Cal.Rptr.2d 38 (2002) ("Such use of the word 'or' in a statute indicates an intention to use it disjunctively so as to designate alternative or separate categories.").

█ The principle of statutory interpretation on which defendants rely is not a universal one. In certain cases, it may make more sense to interpret a phrase including the word "or" as denominating a single category using alternative words, or as a means of emphasis. *See, e.g., United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (reading "error or defect" to create one category of "error"), *citing United States v. Young,* 470 U.S. 1, 15, n. 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *McNally v. United States,* 483 U.S. 350, 358–359, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (second phrase in disjunctive added simply to make the meaning of the first phrase "unmistakable"). Nevertheless, the principle is the conventional default rule. "Normally, use of a disjunctive indicates alternatives and requires that they be treated separately unless such a construction renders the provision repugnant to the Act." *George Hyman Construction Co. v. Occupational Safety & Health Review Comm'n,* 582 F.2d 834, 840 n. 10 (4th Cir.1978).

At oral argument, counsel for *amicus* State Water Resources Control Board offered a common sense solution to the interpretive problem that is both consistent with the default rule of construction and the general purposes of the statute. The disjunctive language, *amicus* submits, merely "establishes the categories of fish that are to be protected." Reporter's Transcript at 54:14–15. The statute does not read "any fish that may be planted *and* exist below the dam" because there may

well not have been any fish planted below the dam. As counsel for *amicus* observed, "[o]bviously, if there are no planted fish there, there is no duty to protect them." *Id.* at 55:1–3. The language of the statute, on this interpretation, is to be read "disjunctively so as to designate alternative or separate categories," *Piscioneri,* 95 Cal. App.4th at 1044, 116 Cal.Rptr.2d 38, as defendants suggest, but the alternative categories involved are existential ones; there may be planted fish or there may not be. Ultimately, however, the statute places a single duty on the dam owner, directing the dam owner to maintain "any fish" that fall into one of two enumerated categories.

The opinion of Justice Blease in *California Trout, Inc. v. Superior Court,* 218 Cal.App.3d 187, 266 Cal.Rptr. 788 (Cal.Ct. App.1990), the only California appellate decision to construe § 5937, is entirely consistent with this interpretation. *Cal Trout* holds that the statute mandates the reestablishment and maintenance of a dry stream's "historic fishery." *Cal. Trout,* 218 Cal.App.3d at 210, 266 Cal.Rptr. 788. As plaintiffs point out, under the Friant defendants' interpretation, however, the statute would allow a dam owner to achieve compliance by building an aquarium below the dam. This interpretation would run counter to common sense, the Court of Appeal's decision and to the Legislature's obvious intent. As *Cal. Trout* put it, "the Legislature has already balanced the competing claims for water ... and determined to give priority to the preservation of their fisheries." *Id.* at 201, 266 Cal.Rptr. 788.[7] Thus, the statute's plain meaning, legislative history, and construction by the state's court all point in a single direction and require this court to

---

7. It is, of course, true that § 5937's priority must be reconciled with the purposes of the CVPIA. As noted in § V of this opinion,

however, there is no apparent reason that the statutes cannot be read as complimentary.

reject the Friant defendants' proposed interpretation of the statute.

## E. WHETHER THE CVPIA PREEMPTS § 5937

### 1. *Prior Rulings*

The Central Valley Project Improvement Act (CVPIA) provides that Friant Dam water is not to be released from the Friant Dam to comply with the provisions of the CVPIA regarding the development of a plan to reestablish fish below the Dam. CVPIA, Pub.L. No. 102–575, § 3406(c)(1), 1992 U.S.C.C.A.N. (106 Stat.) at 4721.

In February 1993, the federal defendants filed a motion to dismiss, arguing that the then recently-enacted CVPIA preempted § 5937 as applied to Friant Dam. The non-federal defendants joined in this motion, and also asserted that original federal authorization of Friant Dam indicated an intent to preempt § 5937. *See* Non–Fed. Defs.' Reply to Plf.'s Opp. to Fed. and Non–Fed. Defs.' Mots. to Dismiss Plfs.' 4th Amend. Compl. at 20 (filed May 24, 1993) ("[F]rom its original planning, construction, and operation, it was always intended that substantial portions of the San Joaquin River would be dry ....").

This court denied these motions to dismiss in October 1993. Order filed Oct. 12, 1993. After rejecting the theory that the CVPIA either expressly preempted § 5937 or "occupied the field" so as to displace state law by implication, *id.* at 31–33, the court considered at length whether § 5937 was in "actual conflict" with the CVPIA. *Id.* at 33–45. After close examination, this court also rejected this preemption theory. The court explicitly ruled that the CVPIA's requirement that the Secretary of the Interior develop a plan to address

fish below Friant Dam "need not preclude application of a state requirement," for "the Secretary's comprehensive plan may be premised upon the Bureau's compliance with section 5937." *Id.* at 39. The court concluded:

> [C]onsidering the language and structure of the CVP Improvement Act and its purpose, the CVP Improvement Act and section 8, insofar as it incorporates section 5937, may be reconciled and that both statutory schemes may operate with one another rather than one being completely ousted. Accordingly, this court cannot conclude that plaintiffs' section 8/section 5937 claim is preempted. Because it is not preempted, *application of section 5937 to the Bureau's operation of the Friant Dam cannot be deemed inconsistent with congressional directives*, and compliance with its mandate is compelled by section 8.

*Id.* at 44–45 (emphasis added; citations omitted); *see also id.* at 35 ("[C]ompliance with both the CVP Improvement Act and section 5937 is not only possible, but required.").

The Ninth Circuit squarely affirmed this court's holdings that § 8 requires compliance with § 5937 and that federal law does not facially preempt § 5937. *See Houston,* 146 F.3d at 1131 ("The Nonfederal defendants challenge the district court's ruling that § 5937 was not, on its face, preempted by federal law. We affirm on the facial preemption issue."). After examining the language and structure of the CVPIA, the Circuit concluded that "[t]here is no clear directive in the CVPIA which preempts the application of § 5937 if the state law could be implemented in a way that is consistent with Congress' plan to develop and restore fisheries below the Friant dam in a manner that is 'reasonable, prudent, and feasible." *Id.* at 1132 (*quoting* CVPIA, Pub.L. 102–575, § 3406(c), 1992 U.S.C.C.A.N. (106 Stat.) at 4721).[8]

---

**8.** It may be that the reasonableness provision of the CVPIA ultimately insulates the Bureau

from the full rigor of the state statute. That

### 2. *Cal Trout, Houston* and *CVPIA* Preemption

In *California Trout, Inc. v. State Water Resources Bd.*, 207 Cal.App.3d 585, 255 Cal.Rptr. 184 (1989), the court considered appeals from the dismissal of petitions for writs of mandate to compel the Water Resources Board to rescind two water appropriation licenses issued to Los Angeles, which allowed the diversion of water by means of dams from four creeks. Plaintiffs contended that the licenses violated Fish and Game Code § 5946, which directed that "[n]o ... license to appropriate water [in portions of Mono and Inyo Counties] shall be issued ... after September 9, 1953, unless conditioned upon full compliance with Section 5937." These provisions, §§ 5946 and 5937, the court observed, "straightforwardly limit the amount of water that may be appropriated by diversion from a dam in the designated area by requiring that sufficient water first be released to sustain fish below the dam." *Id.*, 207 Cal.App.3d at 599, 255 Cal.Rptr. 184.

The opinion expressly did *not* "reach the question of the application of section 5937 alone as a rule affecting the appropriation of water." Rather, the court held that regardless of the original scope of application of section 5937, the purpose of its incorporation into section 5946 is, as section 5946 says, to "condition [ ]", and therefore limit, the "appropriat[ion]" of water by the priority given to the preservation of fish as set forth in section 5937. Section 5946 provides that "[n]o permit or license to appropriate water in District 4 1/2 shall be issued ... after September 9, 1953, unless conditioned upon full compliance with Section 5937." One does not show compliance with a

rule by claiming that it is inapplicable. Compulsory compliance with a rule requiring the release of sufficient water to keep fish alive necessarily limits the water available for appropriation for other uses. Where that effects a reduction in the amount that otherwise might be appropriated, section 5946 operates as a legislative choice among competing uses of water.

*Id.* at 601, 255 Cal.Rptr. 184.

*Cal Trout* does not explicitly hold that § 5937 mandates placing the preservation of fish above the irrigation purposes of a dam, but reserves the question of the statute's application alone as a rule affecting appropriation of water, separate from § 5946. The court simply interprets the statute, based on its plain meaning and context, as "requiring the release of sufficient water to keep fish alive," without addressing the issue whether that requirement might somehow be limited or conditioned in the context of a larger federal statutory regime.

As discussed above, the Supreme Court in *California v. United States*, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), held that the "cooperative federalism" mandated by § 8 required the federal government to comply with state water laws unless such a law was directly inconsistent with clear congressional directives regarding the project. *Id.* at 650, 678, 98 S.Ct. 2985. On remand to the Ninth Circuit, that court concluded that the term "congressional directive" meant a preemptive federal statute. *United States v. California*, 694 F.2d 1171, 1176–77 (9th Cir.1982); *see NRDC v. Houston*, 146 F.3d 1118, 1132 (9th Cir.1998).

In *Houston*, as also explained above, the Ninth Circuit addressed and rejected the

---

possibility, however, is a question of remedies, not of preemption. Put somewhat differently, but to the same effect, whatever the reasonableness component of the CVPIA or-

dains, it is clear that complete diversion of the river, with its concomitant destruction of the historical fisheries, is not reasonable.

non-federal defendants' argument that § 5937 is, on its face, preempted by federal law. The Ninth Circuit's conclusion on this point bears directly on the issue presented in the instant motions. The court held that "[t]here is no clear directive in the CVPIA which preempts the application of § 5937 if the state law could be implemented in a way that is consistent with Congress' plan to develop and restore fisheries below the Friant dam in a manner that is 'reasonable, prudent, and feasible.'" *Id.* at 1132 (*quoting* CVPIA, Pub.L. 102–575, § 3406(c), 1992 U.S.C.C.A.N. (106 Stat.) at 4721).

Thus, the question becomes whether the state statute, § 5937, may in fact be implemented in such a way in this case. That question, as the Ninth Circuit recognized, is not a question of facial incompatibility, but rather one of actual application. For this reason, the court affirmed on the facial preemption question and left open the question of preemption at the remedy stage. *See id.* at 1132 ("it has yet to be determined how much water release would be required under § 5937 and whether that would be consistent with the CVPIA"). Because the instant motions concern only liability under § 5937, such a determination must await the remedial phase of this litigation.

## F. WHETHER THE STATE WATER RESOURCES CONTROL BOARD'S PRIOR DECISION PRECLUDES PLAINTIFFS' CLAIM

█ The primary basis for the Friant defendants' motion for summary adjudication, and an important component of the federal defendants' opposition to the plaintiffs' motion, is their position that the plaintiffs' claim is barred by a prior deci-

sion of the State Water Resource Control Board known as D–935. That ruling, they argue, settled the question of whether § 5937 requires the release of additional water from Friant Dam for fish maintenance and protection, and the issue may therefore not be reopened. As I now explain, for several reasons defendants' argument is not well-taken.

### 1. Law of the Case

This court has already ruled that D–935 does not bar plaintiffs' claim. This ruling is law of the case and may not be relitigated absent a change in law or circumstances. On July 23, 1992, the non-federal defendants filed a motion to dismiss, or in the alternative, to join the Water Resources Control Board as an indispensable party. The defendants argued that "issuance of an order mandating the release of water from Friant Dam for the purpose of maintaining and preserving fish below the dam" might "conflict" with the water rights permit, known as "D–935," that the State Board had issued for Friant Dam; that an order from this court on the § 8/ § 5937 claim could "impede the Board's ability to determine whether and how § 5937 should be applied"; and finally, that "in the absence of the Board, complete relief cannot be accorded." *See* Order at 3, 5–6 (filed Jan. 8, 1993).

The California Attorney General then filed an *amicus* brief on behalf of the State Board supporting the plaintiffs' right to bring their § 8/ § 5937 claim in this Court.[9] The State Board explained that under California law, the judiciary has concurrent jurisdiction to enforce § 5937, *see id.* at 3–7, and that an order from this court enforcing the federal statute would not conflict with the Board's decision in D–935 for at least two reasons, *see id.* at 7–9.

---

**9.** I cannot help but note the irony of the defendants' insistence on the sanctity of a

decision by the Board which it denies.

D–935, decided in the late 1950s, simply made a determination specific to that time that allowing water to remain for fish was not required in the public interest, but explicitly left open the door for a subsequent proceeding to require enhanced flows to restore salmon. *Id.* Moreover, because D–935 set a *ceiling* on water diversions, not a floor, requiring "compliance with section 5937 would not contravene [the Board's] prior issued permits." *Id.*

On January 8, 1993, this court rejected the defendants' motion to dismiss based on the State Board's asserted exclusive jurisdiction and prior order. *See* Order filed Jan. 8, 1993. In doing so, the court specifically held that an order requiring "the release of water for enhancement or preservation of in-stream values ... would not impair or impede D–935 or the Friant Permits." *Id.* at 9. The court further held that, "under California law, the Board does not have exclusive jurisdiction over such decisions." *Id.* at 4. Rather, this Court has jurisdiction over § 8, and given its incorporation of § 5937 and the absence of exclusive Board jurisdiction, this court is empowered to require the Bureau to comply with the state statute's provisions. *Id.* Thus, the argument based on the SWRCB's exclusive jurisdiction and prior ruling—the gravamen of the Friant Defendants' motion for summary adjudication— is entirely foreclosed by the law of the case.

Even if this court were to decide the question *ab initio,* the result would be the same. This is so because (1) D–935 itself did not address the merits of plaintiffs' claim; (2) California law does not confer exclusive jurisdiction on the Board; and (3) the Board's decision is not entitled to preclusive effect under the doctrines of res judicata or collateral estoppel. The California Attorney General has again submit-

ted an *amicus* brief on behalf of the State Water Resources Control Board. The Board adopts each of these three positions.

### 2. *D–935 Did Not Address Plaintiffs' Claim*

First, and perhaps most importantly, this court notes that the State Board decision at issue, D–935, does not so much as mention § 5937, let alone provide a ruling on the issue entitled to preclusive weight. In this regard, it is significant that the State Board disagrees with the defendant's characterization of its ruling. *See Amicus Curiae* State Water Resource Control Board's Mem. in Oppo. to Def's Mot. and in Supp. of Pl's Mot. (filed January 22, 2004), at 2 ("The defendant-intervenors have mischaracterized Water Right Decision 935 ... Decision 935 does not contain *any* findings or conclusions regarding Section 5937."). As the Board points out:

[I]n decision 935, the State Board did not make *any* findings or render any conclusions regarding Section 5937 of the Fish and Game Code. If the Court reviews the entire 109 pages of Decision 935, the Court will find that the State Board did not at any point discussion Section 5937 ... Indeed, if the Court electronically scanned Decision 935 and applied a word search software to the text, the Court would discover that the terms "Fish and Game Code" and "5937" do not appear separately or conjunctively anywhere in the decision. The defendant-intervenors' claim that Decision 935 contains findings and conclusions regarding the applicability of Section 5937 to the Friant Unit of the Central Valley Project, is therefore, flatly wrong.

*Id.* at 5; *see generally id.* at 4–9; *see* Amicus State Board's Request for Judicial Notice.[10] Thus, even if the Board's deci-

---

**10.** Amicus State Board has filed a request for judicial notice of the full text of Decision 935.

sion were entitled to preclusive weight, it would be of no moment here, because the Board did not in fact address the issue at hand.

### 3. Concurrent v. Exclusive Jurisdiction

Second, as noted above, the Board also takes the position that it does not have exclusive jurisdiction over the issues presented here, and that the better course would be to use the procedure of court reference to the agency when and if it becomes necessary to do so. *See Amicus Curiae* State Water Resource Control Board's Mem. in Oppo. to Def's Mot. and in Supp. of Pl's Mot. (filed January 22, 2004), at 2 ("The defendant-intervenors have improperly described the California doctrine of concurrent jurisdiction as it relates to public trust-related claims such as Section 5937 of the Fish and Game Code. [The California Supreme Court has] held that the doctrine of concurrent jurisdiction applies to public trust-related claim, such as the plaintiffs' claim under Section 5937."). This court independently concludes that the Board's position is consistent with this court's prior orders and with California case law. As the California Supreme Court explained in *National Audubon Society v. Superior Court*, 33 Cal.3d 419, 449, 189 Cal.Rptr. 346, 658 P.2d 709 (1983), "[a] long line of decisions indicates that remedies before the Water Board are not exclusive, but that the courts have concurrent original jurisdiction." Pursuant to their concurrent jurisdiction, the courts may employ the Water Board as a master. *Id.* at 451, 189 Cal.Rptr. 346, 658 P.2d 709. For these reasons, the courts retain jurisdiction to fashion a judicial remedy for enforcement of the statutory mandate appropriate to the circumstances. *Cal. Trout v. Superior Court*, 218 Cal. App.3d 187, 266 Cal.Rptr. 788 (1990). Ac-

cordingly, the Water Resources Control Board does not possess exclusive jurisdiction over plaintiffs' § 8/ § 5937 claim.

### 4. D-935 Is Not Entitled to Preclusive Effect

Third, even if D-935 did address the merits of plaintiffs' claim, it would be not be entitled to preclusive effect under the doctrine of claim preclusion.

The doctrine of claim preclusion "treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.' … [T]he effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties whether or not raised at trial." *Haphey v. Linn County*, 924 F.2d 1512, 1515 (9th Cir.1991). Under 28 U.S.C. § 1738, federal courts are required to give preclusive effect to state court reviewed administrative determinations. In *Miller v. County of Santa Cruz*, 39 F.3d 1030, 1032–33 (9th Cir.1994), the Ninth Circuit held that, as a matter of federal common law, preclusive effect must also be given to "state administrative adjudications of legal as well as factual issues, *even if unreviewed,* so long as the state proceeding satisfies the requirements of fairness outlined in *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)." (emphasis added) (parallel citations and internal quotations omitted). Defendants argue that the Board's unreviewed decision in D-935 should be accorded preclusive effect. Again, the Board itself takes the opposite position from defendants. *See Amicus Curiae* State Water Resource Control Board's Mem. in Oppo. to Def's Mot. and in Supp. of Pl's Mot. (filed January 22, 2004), at 3 ("The doctrines of res

The court grants the request and takes notice of the text of the Decision.

judicata or collateral estoppel do not bar the plaintiffs from raising their Fish and Game Code section 5937 claim.").

It is hardly clear from the record that the process before the State Water Resources Control Board was sufficiently similar to a judicial process to make claim preclusion appropriate. *Miller* makes clear that an administrative ruling is *only* entitled to preclusive effect when that proceeding "was conducted with sufficient safeguards to be equated with a state court judgment." 39 F.3d at 1032; *see Misischia v. Pirie,* 60 F.3d 626, 629 (9th Cir.1995) (holding that findings of administrative agencies must satisfy both requirements for preclusion and procedural fairness to have preclusive effect in federal court); *Embury v. King,* 191 F.Supp.2d 1071, 1082 (N.D.Cal.2001) (declining to give preclusive effect to unreviewed administrative decision where procedural safeguards were lacking).

The *Miller* court held that three threshold requirements, known as the *Utah Construction* factors, must be met: (1) that the administrative agency act in a judicial capacity, (2) that the agency resolve disputed issues of fact properly before it, and (3) that the parties have an adequate opportunity to litigate." 39 F.3d at 1033 (*citing Utah Construction,* 384 U.S. at 422, 86 S.Ct. 1545).[11] As the Board's brief argues, "[b]ecause the State Board's predecessor made no final determination of the applicability of Fish and Game Code Section 5937 to Friant Dam in Decision 935, there can be no identity of issues, no final judgment on the merits of this issue, and consequently, no preclusive effect." SWRCB Amicus Br. at 15.

More fundamentally, there can be no claim preclusion here because the parties have not, under *Miller,* had "an adequate opportunity to litigate." 39 F.3d at 1033. This is so because of the simple fact that there is no privity between the present plaintiffs and any of the parties in D–935.

For the foregoing reasons, the court cannot conclude that the State Board's past decision forecloses plaintiffs' present claim.

## G. WHETHER THE BUREAU HAS VIOLATED § 5937

■ Finally, with the defendants' various contentions having been dispensed with, it is possible to arrive at the question of liability under § 5937. As it happens, the issue as to the actual merits of plaintiffs' first claim is among the least difficult of the issues presented.

In *Cal. Trout,* Justice Blease addressed how much water must be released into a dry river to comply fully with § 5937. "The answer," he said, "is enough to restore the historic fishery." 218 Cal.App.3d at 210, 266 Cal.Rptr. 788. To implement this mandate, the court directed the City of Los Angeles to "release sufficient water into the streams from its dams to reestablish and maintain the fisheries which existed in them prior to [the City's] diversion of water." *Id.* at 213, 266 Cal.Rptr. 788.

In opposing plaintiffs' motion, the defendants have focused their energies on various reasons why their claims should be barred. There is no genuine dispute, however, as to whether the Bureau has released sufficient water to maintain historic fisheries, and the record, in any event, is clear that the Bureau has not. The administrative record, which defendants strenuously insisted must be produced before the court could rule on the instant motions,

---

11. In *Miller,* these factors were satisfied; the county commission had rendered its decision only after "a public evidentiary hearing at which Miller was represented by counsel and

was permitted to present oral and documentary evidence and to call witnesses." 39 F.3d at 1032.

merely confirms this fact. Indeed, plaintiffs' supplemental briefing contains ample evidence derived from the record that establishes in great detail the impact of the Friant Dam's operations on the native fish populations. *See* Pl's Corrected Supp. Br. in Supp. of Mot. For Summ. Adj. (filed July 13, 2004), at 6–17.

The Bureau, by its own admission, releases no water for this purpose and long stretches of the River downstream are dry most of the time. *See* Fed'l Defs.' Resp. to Plfs.' "Sep. Statement of Undisputed Facts in Support of Plfs.' Mot. for Summ. J.," ¶ 8, at 3 (filed July 2, 1992).[12] Ten years ago, the Bureau commissioned the Department of the Interior's Fish and Wildlife Service to investigate and report on Chinook salmon in the upper San Joaquin River. The opening page of the report states:

> Historically, the upper San Joaquin River supported a large spring-run of chinook salmon. The annual spawning run of these fish numbered in the tens of thousands as late as the mid–1940s. Although only sparse or incomplete records are available, there probably was a fall-run of chinook salmon as well. Counts made at the Dos Palos USGS gaging station indicate that fall-run escapement averaged about 1,000 spawners in the 1940s. Both of these salmon stocks were extirpated when Friant Dam became fully operational.

The extinction of these San Joaquin stocks can be directly attributed to inadequate instream flows, specifically, those which enable adult salmon to migrate upstream.... The project diverted nearly the entire river and a long reach of the waterway had been dried up.

U.S. Dep't of the Interior, Fish & Wildlife Service, *The Relationship Between Instream Flow, Adult Immigration, and Spawning Habitat Availability for Fall–Run Chinook Salmon in the Upper San Joaquin River, California* at 6 (Sept.1994) (citations omitted) (Macaux Decl., Ex. J). There can be no genuine dispute that many miles of the San Joaquin River are now entirely dry, except during extremely wet periods, and that the historic fish populations have been destroyed.

Accordingly, the court concludes that the Bureau of Reclamation has violated § 5937 of the California Fish and Game Code as applied to it by virtue of § 8 of the Reclamation Act of 1902.[13]

## IV.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary adjudication as to liability alone on their first claim is hereby GRANTED and the Friant Defendants' and Chowchilla Water District's motions

---

12. At oral argument, the non-federal defendants asked, in effect, how far below the dam was "below the dam" for § 5937 purposes. It appears to the court that the inquiry begs the question. If the dam's operation interferes with the well being of the historic fisheries in the river, under *Cal Trout,* the dam must be operated to obviate that result.

13. That this court has reached the conclusion that the Bureau has violated its duty hardly begins to address the problem of remedies. In this regard, the court notes not only the issue of whether the reasonableness compo-

nent of the CVPIA constitutes an overlay on the Bureau's duties, but as the non-federal defendants noted in oral argument, farmers throughout the valley have dedicated their lives and fortunes to making the desert bloom. They did so in reliance on the availability of CVP water. That reality most likely should be taken into account when the court comes to address a remedy. *See Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 553–54, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Save the Yaak Committee v. Block,* 840 F.2d 714, 722 (9th Cir.1988).

for summary adjudication are hereby DE-
NIED.

IT IS SO ORDERED.